## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| UNITED SITE SERVICES, INC. *et al.*,[1] | ) ) ) | Case No. 25-[_] [(__)] |
| Debtors. | ) ) ) ) | (Joint Administration to be Requested) |

## JOINT PREPACKAGED PLAN
## OF REORGANIZATION OF UNITED SITE SERVICES, INC. AND ITS
## DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**MILBANK LLP**

Dennis F. Dunne, Esq.
Samuel A. Khalil, Esq.
Matthew L. Brod, Esq.
Lauren C. Doyle, Esq.
55 Hudson Yards
New York, New York 10001
Telephone:    (212) 530-5000
Facsimile:    (212) 530-5219

*Proposed Counsel for Debtors in Possession*

**COLE SCHOTZ P.C.**

Michael D. Sirota
Felice R. Yudkin
Daniel J. Harris

Court Plaza North, 25 Main Street
Hackensack, NJ 07601
Telephone:    1 (201) 489-3000

*Proposed Co-Counsel for Debtors in Possession*

Dated: December 28, 2025

---

[1] The Debtors in the anticipated chapter 11 cases, along with the last four digits of each one's federal tax identification number, are: United Site Services, Inc. (3387); Johnny on the Spot, LLC (1604); Northeast Sanitation, Inc. (3569); PECF USS Intermediate Holding II Corporation (5368); PECF USS Intermediate Holding III Corporation (9019); Portable Holding Corporation (2044); Portable Intermediate Holding Corporation (2150); Portable Intermediate Holding II Corporation (2253); Russell Reid Waste Hauling and Disposal Service Co., Inc. (5208); United Site National Services Company (4933); United Site Services Northeast, Inc. (3022); United Site Services of California, Inc. (8969); United Site Services of Colorado, Inc. (5717); United Site Services of Florida, LLC (1631); United Site Services of Louisiana, Inc. (0960); United Site Services of Maryland, Inc. (1689); United Site Services of Mississippi, LLC (7131); United Site Services of Nevada, Inc. (8145); United Site Services of Texas, Inc. (3850); USS Ultimate Holdings, Inc. (8857); Vortex Holdco, LLC (6868); and Vortex Opco, LLC (6864). The Debtors' service address is 118 Flanders Road, Suite 1000, Westborough, MA 01581.

## TABLE OF CONTENTS

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF
TIME, AND GOVERNING LAW ........................................................................ 1

    A.    Defined Terms ........................................................................... 1
    B.    Rules of Interpretation ............................................................. 22
    C.    Computation of Time ............................................................... 22
    D.    Governing Law ........................................................................ 23
    E.    Controlling Document .............................................................. 23
    F.    Consultation, Information, Notice, and Consent Rights. ........................ 23

ARTICLE II ADMINISTRATIVE CLAIMS AND OTHER UNCLASSIFIED CLAIMS ......... 23

    A.    Administrative Claims ............................................................. 23
    B.    Professional Fee Claims ........................................................... 24
        1.    Final Fee Applications ................................................... 24
        2.    Professional Fee Escrow Account ............................... 25
        3.    Post-Effective Date Fees and Expenses ...................... 25
    C.    DIP Claims ............................................................................... 25
    D.    Priority Tax Claims .................................................................. 26
    E.    Restructuring Expenses ............................................................ 26

ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ...... 26

    A.    Classification of Claims and Interests ...................................... 26
    B.    Treatment of Claims and Interests ........................................... 27
        1.    **Class 1 – Priority Non-Tax Claims** ...................................... 28
        2.    **Class 2 – Other Secured Claims** .......................................... 28
        3.    **Class 3 – ABL Facility Claims** ............................................. 28
        4.    **Class 4 – First-Out Revolving Loans Claims** .......................... 29
        5.    **Class 5 – First-Out Term Loans/Notes Claims** ....................... 30
        6.    **Class 6 – First Lien Secured Claims** ..................................... 30
        7.    **Class 7 – Unsecured Funded Debt Claims** ............................. 31
        8.    **Class 8 – General Unsecured Claims** ..................................... 31
        9.    **Class 9 – Intercompany Claims** ............................................ 32
        10.    **Class 10 – Intercompany Interests** ....................................... 32
        11.    **Class 11 – Existing Equity Interests** .................................... 32
        12.    **Class 12 – Subordinated Claims Class** ................................. 33
    C.    Special Provision Governing Unimpaired Claims ..................... 33
    D.    Elimination of Vacant Classes ................................................. 33
    E.    Voting Classes, Presumed Acceptance by Non-Voting Classes .......... 33
    F.    Existing Equity Interests and Intercompany Interests ............. 33
    G.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the
Bankruptcy Code ..................................................................... 34

H.      Subordinated Claims and Interests........................................................................ 34

ARTICLE IV MEANS FOR IMPLEMENTATION OF PLAN ................................................. 34

A.      General Settlement of Claims and Interests.......................................................... 34
B.      Restructuring Transactions ................................................................................... 34
C.      Sources of Consideration for Restructuring Transactions .................................... 35
        1.      Cash.......................................................................................................... 35
        2.      Exit Term Loan Facility, Exit RCF Facility, and Exit ABL Facility........ 36
        3.      Equity Rights Offering and ERO Backstop Agreement ........................... 37
        4.      New Common Shares ................................................................................ 38
D.      Corporate Existence .............................................................................................. 39
E.      Vesting of Assets in the Reorganized Debtors ...................................................... 39
F.      Cancellation of Loans, Securities, and Agreements ............................................. 39
G.      Corporate and Other Entity Action ....................................................................... 41
H.      New Organizational Documents ............................................................................ 41
I.      Directors and Officers of Reorganized Debtors..................................................... 42
        1.      Reorganized Parent Board ........................................................................ 42
        2.      Officers of Reorganized Debtors .............................................................. 42
        3.      New Subsidiary Boards.............................................................................. 42
J.      Exemption from Securities Laws........................................................................... 43
        1.      Section 4(a)(2) of the Securities Act, Regulation D and Regulation S..... 43
        2.      Section 1145 Exemption ........................................................................... 43
K.      Effectuating Documents; Further Transactions ..................................................... 44
L.      Section 1146 Exemption ........................................................................................ 45
M.      Preservation of Causes of Action........................................................................... 45
N.      Management Incentive Plan.................................................................................... 46
O.      DTC Eligibility ...................................................................................................... 46

ARTICLE V TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
        LEASES........................................................................................................................... 46

A.      Assumption by Default .......................................................................................... 46
B.      Assumed Executory Contracts and Unexpired Leases .......................................... 47
C.      Rejected Executory Contracts or Unexpired Leases.............................................. 49
D.      Particular Contracts and Leases ............................................................................ 49
        1.      Insurance Policies ..................................................................................... 49
        2.      Indemnification Provisions ....................................................................... 50
        3.      Compensation and Benefits Programs ...................................................... 50
E.      Modifications, Amendments, Supplements, Restatements, or Other
        Agreements ............................................................................................................ 51
F.      Reservation of Rights............................................................................................. 51
G.      Nonoccurrence of Effective Date........................................................................... 51
H.      Contracts and Leases Entered into After Petition Date ......................................... 52

ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS ................................................. 52

A.    Timing and Calculation of Amounts to Be Distributed ........................................ 52
B.    Disbursing Agent ................................................................................................... 52
C.    Rights and Powers of Disbursing Agent ............................................................... 52
      1.    Powers of the Disbursing Agent ................................................................. 52
      2.    Incurred Expenses ....................................................................................... 53
D.    Delivery of Distributions and Undeliverable or Unclaimed Distributions ........... 53
      1.    Delivery of Distributions in General ........................................................... 53
      2.    Distribution Record Date ............................................................................ 53
      3.    Minimum Distributions ............................................................................... 54
      4.    Undeliverable Distributions and Unclaimed Property ............................... 54
      5.    Distributions on Account of Obligations of Multiple Debtors ................. 55
E.    Indefeasible Distributions ..................................................................................... 55
F.    Compliance with Tax Requirements ...................................................................... 55
G.    Allocations ............................................................................................................. 55
H.    No Postpetition Interest on Claims ....................................................................... 55
I.    Setoffs and Recoupment ........................................................................................ 55
J.    Claims Paid or Payable by Third Parties .............................................................. 56
      1.    Claims Paid by Third Parties ...................................................................... 56
      2.    Applicability of Insurance Policies ............................................................. 56
      3.    Single Satisfaction of Claims ..................................................................... 56
K.    Allocation Between Principal and Accrued Interest ............................................. 57

ARTICLE VII PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED
            AND DISPUTED CLAIMS ................................................................................. 57

A.    Disputed Claims Process ....................................................................................... 57
B.    Allowance of Claims .............................................................................................. 57
C.    Claims Administration Responsibilities ............................................................... 58
D.    Estimation of Claims and Interests ...................................................................... 58
E.    Time to File Objections to Claims ........................................................................ 58
F.    Disallowance of Claims ......................................................................................... 58
G.    Distributions to Holders of Disputed Claims ....................................................... 59

ARTICLE VIII SETTLEMENT, RELEASE, INJUNCTION, AND RELATED
            PROVISIONS ..................................................................................................... 59

A.    Compromise and Settlement .................................................................................. 59
B.    Discharge of Claims and Termination of Interests ............................................... 60
C.    Release of Liens ..................................................................................................... 60
D.    Releases by the Debtors ......................................................................................... 61
E.    Releases by Holders of Claims or Interests .......................................................... 63
F.    Exculpation ............................................................................................................ 64
G.    Injunction ............................................................................................................... 65

ARTICLE IX CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE ..................... 66

    A.     Conditions to Effective Date................................................................................. 66
    B.     Waiver of Conditions........................................................................................... 68
    C.     Effect of Failure of Conditions ............................................................................ 68

ARTICLE X MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN ................. 68

    A.     Modification and Amendments............................................................................. 68
    B.     Effect of Confirmation on Modifications ............................................................. 69
    C.     Revocation or Withdrawal of Plan........................................................................ 69

ARTICLE XI RETENTION OF JURISDICTION......................................................................... 69

ARTICLE XII MISCELLANEOUS PROVISIONS .................................................................... 72

    A.     Immediate Binding Effect..................................................................................... 72
    B.     Additional Documents .......................................................................................... 72
    C.     Payment of Statutory Fees .................................................................................... 72
    D.     Reservation of Rights............................................................................................ 73
    E.     Successors and Assigns......................................................................................... 73
    F.     Notices .................................................................................................................. 73
    G.     Term of Injunctions or Stays................................................................................ 74
    H.     Entire Agreement.................................................................................................. 75
    I.     Exhibits ................................................................................................................ 75
    J.     Non-severability of Plan Provisions ..................................................................... 75
    K.     Votes Solicited in Good Faith............................................................................... 75
    L.     Closing of Chapter 11 Cases................................................................................. 75
    M.     Document Retention ............................................................................................. 76
    N.     Dissolution of Committee ..................................................................................... 76
    O.     Deemed Acts......................................................................................................... 76
    P.     Waiver or Estoppel .............................................................................................. 76

**Introduction**

United Site Services, Inc. ("USS"); Johnny on the Spot, LLC; Northeast Sanitation, Inc.; PECF USS Intermediate Holding II Corporation; PECF USS Intermediate Holding III Corporation; Portable Holding Corporation; Portable Intermediate Holding Corporation; Portable Intermediate Holding II Corporation; Russell Reid Waste Hauling and Disposal Service Co., Inc.; United Site National Services Company; United Site Services Northeast, Inc.; United Site Services of California, Inc.; United Site Services of Colorado, Inc.; United Site Services of Florida, LLC; United Site Services of Louisiana, Inc.; United Site Services of Maryland, Inc.; United Site Services of Mississippi, LLC; United Site Services of Nevada, Inc.; United Site Services of Texas, Inc.; USS Ultimate Holdings, Inc.; Vortex Holdco, LLC; and Vortex Opco, LLC (each a "Debtor" and, collectively, the "Debtors"), propose this plan of reorganization (as it may be amended, supplemented, restated, or modified from time to time and together with the Plan Supplement, the "Plan") for the resolution of all outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used and not otherwise defined have the meanings ascribed to such terms in Article I.A.

Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor. The classifications of Claims and Interests set forth in Article III of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, to the extent applicable. The Plan does not contemplate substantive consolidation of any of the Debtors.

Holders of Claims and Interests should refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan.

**THE PLAN IS BEING SOLICITED FOR ACCEPTANCE OR REJECTION IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126. THE PLAN WILL BE SUBMITTED TO THE COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTORS' FILING FOR CHAPTER 11 BANKRUPTCY.**

**ALL CREDITORS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT ACCOMPANYING THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3019 AND THE PLAN, THE DEBTORS RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW THE PLAN PRIOR TO ITS SUBSTANTIAL CONSUMMATION.**

*[Remainder of page intentionally left blank]*

## ARTICLE I
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

A.      *Defined Terms*

As used in the Plan, capitalized terms have the meanings set forth below:

1.      "2024 *First Lien Facilities*" means the debt facilities issued under or governed by each of the First-Out/Second-Out Documents, First-Out Notes Documents, Third-Out Notes Documents, and the Intercompany Credit Agreement Documents.

2.      "*2024 First Lien Intercreditor Agreement*" means that certain Amended and Restated First Lien Intercreditor Agreement, dated as of August 22, 2024, by and among the collateral agents under each of the 2024 First Lien Facilities and the Amended Term Loan Agent.

3.      "*2024 Transactions*" means the 2024 recapitalization and exchange transactions among the Debtors, the Sponsor and certain creditors of the Debtors, including the bridge facility made available to the Debtors by the Sponsor.

4.      "*2024 Transactions Documents*" means the documents authorizing or governing the 2024 Transactions.

5.      "*ABL Agent*" means Bank of America, N.A., or any successor, in its capacity as administrative agent and collateral agent under the ABL Facility Credit Agreement.

6.      "*ABL Facility*" means the asset-based revolving loan and letter of credit facility made available by the ABL Lenders to the Debtors pursuant to and subject to the terms and conditions of the ABL Facility Credit Agreement.

7.      "*ABL Facility Claims*" means all Claims arising under, derived from, based upon or related to the ABL Facility Documents including, without limitation, all "Obligations" (as defined in the ABL Facility Credit Agreement).

8.      "*ABL Facility Credit Agreement*" means that certain Revolving Credit Agreement, dated as of December 17, 2021, among USS Parent, as Holdings, PECF USS Intermediate Holding III Corporation, as Intermediate Holdings, USS Ultimate Holdings, Inc., as Lead Borrower, other Debtors as borrowers or guarantors, various lenders and issuing banks party thereto from time to time, and Bank of America, N.A. as a swingline lender and ABL Agent, as amended from time to time.

9.      "*ABL Facility Documents*" means, collectively, the ABL Facility Credit Agreement and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, and other security documents, as amended, supplemented, or modified from time to time.

10. "*ABL Intercreditor Agreement*" means that certain ABL Intercreditor Agreement, dated as of December 17, 2021, and amended and restated on August 22, 2024, by and among the ABL Agent, the Amended Term Loan Agent, the First-Out/Second-Out Agent, the Intercompany Credit Agreement Agent, the First-Out Notes Trustee and the Third-Out Notes Trustee, as amended from time to time.

11. "*ABL Lenders*" means the financial institutions party from time to time to the ABL Facility Credit Agreement as lenders, issuing banks, or bank product providers, in their respective capacities as such.

12. "*ABL Letters of Credit*" means the letters of credit made available by certain of the ABL Lenders to the Debtors pursuant to and subject to the terms and conditions of the ABL Facility Credit Agreement.

13. "*ABL Revolving Loans*" means those revolving loans made available by certain of the ABL Lenders to the Debtors pursuant to and subject to the terms and conditions of the ABL Facility Credit Agreement.

14. "*Ad Hoc Group*" means that certain ad hoc group of Holders of First-Out Term Loans Claims, First-Out Notes Claims, Second-Out Claims, Second-Out Deficiency Claims, and Third-Out Claims represented by the Ad Hoc Group Advisors.

15. "*Ad Hoc Group Advisors*" means (a) Akin Gump Strauss Hauer & Feld LLP, as counsel to the Ad Hoc Group, (b) Kirkland & Ellis LLP, as counsel solely to Ad Hoc Group member Clearlake Capital Group, (c) Centerview Partners LLC as investment banker for the Ad Hoc Group, (d) any local counsel, and (e) such other advisors as agreed in writing by the Debtors.

16. "*Adjustment Determination Amount*" means the greater of (i) zero and (ii) the difference between (a) the Plan Effective Date Projected Liquidity and (b) the Target Liquidity.

17. "*Administrative Claim*" means a Claim against any of the Debtors arising on or after the Petition Date and before the Effective Date for a cost or expense of administration of the Chapter 11 Cases pursuant to sections 503(b), and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including the actual and necessary costs and expenses of preserving the Estates and operating the businesses of the Debtors.

18. "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code. With respect to any Entity that is not a Debtor, the term Affiliate shall apply to such Entity as if the Entity were a Debtor.

19. "*Agents/Trustees*" means, collectively, the ABL Agent, First-Out Notes Trustee, the First-Out/Second-Out Agent, Intercompany Credit Agreement Agent, the Amended Term Loan Agent, the Third-Out Notes Trustee, and the Amended Unsecured Notes Trustee.

20. "*Allowed*" means, as to a Claim or Interest, a Claim or an Interest expressly allowed under this Plan, under the Bankruptcy Code, or by a Final Order, as applicable. For the avoidance of doubt, (a) there is no requirement to file a proof of Claim (or move the Court for allowance) to be an Allowed Claim under the Plan (except as otherwise provided in the Plan) and (b) the Debtors,

with the consent of the Required Consenting Second-Out Creditors, which shall not be unreasonably withheld, delayed, or conditioned, or the Reorganized Debtors, as applicable, may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy Law; *provided, however*, that the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to this Plan. "Allow", "Allowance" and "Allowing" shall have correlative meanings.

21.     "*Amended Term Loan Agent*" means Wilmington Fund Savings Society, FSB, or any successor, in its capacity as administrative agent and collateral agent under the Amended Term Loan Credit Agreement.

22.     "*Amended Term Loan Claims*" means all Claims arising under, derived from, based upon or related to the Amended Term Loan Credit Facility Documents (including Claims on account of the "Obligations" as defined in the Amended Term Loan Credit Agreement).

23.     "*Amended Term Loan Credit Agreement*" means that certain Credit Agreement dated as of December 17, 2021, among USS Parent, as Holdings, PECF USS Intermediate Holding III Corporation, as borrower, other Debtors, as borrowers or guarantors, various lenders and issuing banks party thereto from time to time, and Wilmington Fund Savings Society, FSB, as administrative agent and collateral agent (as amended by that certain Amendment No. 1, dated as of June 23, 2023, that certain Amendment No. 2, dated as of June 28, 2023 and that certain Amendment No. 3, dated as of August 22, 2024, as amended, supplemented or otherwise modified from time to time).

24.     "*Amended Term Loan Credit Facility Documents*" means, collectively, the Amended Term Loan Credit Agreement and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, and other security documents, as amended, supplemented, or modified from time to time.

25.     "*Amended Term Loan Deficiency Claims*" means all unsecured deficiency Claims arising from or related to the Amended Term Loan Credit Facility Documents, which shall be Allowed in an amount equal to $30,329,377.

26.     "*Amended Term Loans*" means the loans outstanding under the Amended Term Loan Credit Agreement.

27.     "*Amended Unsecured Notes*" means those certain 8.000% senior unsecured notes due 2029 issued by PECF USS Intermediate Holding III Corporation pursuant to the Amended Unsecured Notes Indenture.

28.     "*Amended Unsecured Notes Claims*" means all Claims arising under, derived from, based upon, or related to the Amended Unsecured Notes Indenture (including all "Obligations" as defined therein).

29.     "*Amended Unsecured Notes Indenture*" means that certain Indenture, dated as of November 19, 2021, by and among PECF USS Intermediate Holding III Corporation, as issuer,

3

the guarantors party thereto and Wilmington Trust, National Association, as trustee (as supplemented from time to time).

30. "*Amended Unsecured Notes Trustee*" means Wilmington Trust, National Association or any successor, in its capacity as trustee under the Amended Unsecured Notes Indenture.

31. "*Article*" refers to an article of the Plan.

32. "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies arising under chapter 5 of the Bankruptcy Code or under similar or related local, state, federal, or foreign statutes or common law, including fraudulent transfer laws, that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law.

33. "*Ballot*" means a ballot for acceptance or rejection of the Plan and for making an election with respect to the Third-Party Release provided by Article VIII of the Plan.

34. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended and as in effect on the Confirmation Date or otherwise applicable to the Chapter 11 Cases.

35. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as amended from time to time and as applicable to the Chapter 11 Cases, promulgated pursuant to 28 U.S.C. § 2075 and the general, local, and chamber rules of the Court.

36. "*Blue Sky Laws*" has the meaning ascribed to such term in Article IV.J.

37. "*Business Day*" means any day other than a Saturday, Sunday, "legal holiday" (as defined in Bankruptcy Rule 9006(a)), or another day on which commercial banks in New York are required or authorized by law to remain closed.

38. "*Cash*" means cash and cash equivalents in U.S. dollars.

39. "*Causes of Action*" means collectively, any and all claims, interests, controversies, actions, proceedings, reimbursement claims, contribution claims, recoupment rights, debts, third-party claims, indemnity claims, damages, remedies, causes of action, demands, rights, suits, obligations, liabilities, accounts, judgments, defenses, offsets, powers, privileges, licenses, franchises, Liens, guaranties, Avoidance Actions, agreements, counterclaims, and cross-claims, of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, asserted or unasserted, direct or indirect, assertable directly or derivatively, choate or inchoate, reduced to judgment or otherwise, secured or unsecured, whether arising before, on, or after the Petition Date, in tort, law, equity, or otherwise pursuant to any theory of civil law (whether local, state, or federal law). For the avoidance of doubt, Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b)

any claim (whether under local, state, federal law) based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, fraudulent transfer or fraudulent conveyance or voidable transaction law, violation of local, state, or federal law or breach of any duty imposed by law or in equity, including securities laws and negligence; (c) the right to object to or otherwise contest Claims or Interests; (d) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; and (e) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in Bankruptcy Code section 558.

40.     "*Chapter 11 Case(s)*" means (a) when used with reference to a particular Debtor, the chapter 11 case filed for that Debtor under chapter 11 of the Bankruptcy Code in the Court and (b) when used with reference to all Debtors, the jointly administered chapter 11 cases for all of the Debtors in the Court.

41.     "*Claim*" means any "claim," as such term is defined in section 101(5) of the Bankruptcy Code, against a Debtor.

42.     "*Claims and Noticing Agent*" means the claims and noticing agent retained in the Chapter 11 Cases, in its capacity as such.

43.     "*Class*" means a class of Claims or Interests designated in Article III of the Plan, pursuant to section 1122 of the Bankruptcy Code.

44.     "*Committee*" means a statutory committee of unsecured creditors appointed in the Chapter 11 Cases by the U.S. Trustee, if any, pursuant to section 1102 of the Bankruptcy Code.

45.     "*Committee Professionals*" means the persons or firms retained by the Committee, if any, pursuant to sections 327, 328, or 1103 of the Bankruptcy Code.

46.     "*Compensation and Benefits Programs*" means (i) all employment and severance agreements, arrangements, programs and policies, and all employment, wages, compensation, and benefit plans, arrangements, programs and policies, workers' compensation programs, savings plans, retirement plans, deferred compensation plans, nonqualified deferred compensation plans, supplemental executive retirement plans, healthcare plans, disability plans, severance benefit plans, bonus, commission, incentive and retention plans, programs, and payments, life and accidental death and dismemberment insurance plans and programs, for all employees of the Debtors, and all amendments and modifications thereto, applicable to the Debtors' employees, former employees, retirees, and non-employee directors and managers, in each case existing immediately prior to the Effective Date and, (ii) to the extent not enumerated, all other Employment Agreements existing immediately prior to the Effective Date.

47.     "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

48.     "*Confirmation Date*" means the date upon which the Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

49.     "*Confirmation Order*" means the Court order approving the Disclosure Statement on a final basis and confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

50.     "*Consenting Stakeholders*" has the meaning ascribed to such term in the Restructuring Support Agreement.

51.     "*Consummation*" means the occurrence of the Effective Date.

52.     "*Contract Objection Deadline*" has the meaning ascribed to it in Article V.B.

53.     "*Court*" means the United States Bankruptcy Court for the District of New Jersey or any other court having jurisdiction over the Chapter 11 Cases.

54.     "*Cure*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's default under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

55.     "*D&O Policy*" means any Insurance Policy (including any "tail policy") issued or providing coverage to any of the Debtors (and any of their predecessors) for certain liabilities of the Debtors and/or their current or former directors', members', trustees', officers', managers, and/or employees' liability and all agreements, documents, or instruments relating thereto.

56.     "*Debtor*" or "*Debtors*" has the meaning specified in the Introduction hereto.

57.     "*Debtor Release*" has the meaning ascribed to such term in Article VIII.D.

58.     "*Definitive Documents*" has the meaning ascribed to such term in the Restructuring Support Agreement and includes (i) the Plan (and any and all exhibits, annexes and schedules thereto), (ii) the Restructuring Steps Memorandum, (iii) the DIP Facility Documents and the DIP Orders, (iv) the Confirmation Order and the order approving the adequacy of the Disclosure Statement (which may be the Confirmation Order), (v) the Disclosure Statement (and any and all exhibits, annexes and schedules thereto), (vi) the New Organizational Documents, including the Governance Term Sheet, (vii) the ERO Documents, (viii) the Exit Term Loan Facility Documents, (ix) the Exit ABL Facility Documents, (x) the Exit RCF Facility Documents, (xi) the Exit ABL Facility Term Sheet, (xii) the Exit RCF Facility Term Sheet, (xiii) the Exit Term Loan Facility Term Sheet, and (xiv) any and all other deeds, agreements, filings, notifications, pleadings, orders, certificates, letters, instruments or other documents reasonably necessary to consummate and document the foregoing clauses (i) through (xiii).

59.     "*DIP Agent*" means Wilmington Savings Fund Society, FSB, in its capacity as administrative agent and collateral agent under the DIP Credit Agreement or an agent reasonably acceptable to the Debtors and Required Backstop DIP Lenders (as defined in the DIP Credit Agreement), in its capacity as administrative agent and collateral agent under the DIP Facility.

60.     "*DIP Claims*" means any and all Claims arising under, derived from, based on, or related to the DIP Facility, including, without limitation, Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder, in each case, with respect to the DIP Facility, including, for the avoidance of doubt, such Claims held by the DIP Lenders or the DIP Agent.

61. "*DIP Credit Agreement*" means that certain Superpriority Secured Debtor in Possession Credit Agreement, among USS Parent, as Holdings, PECF USS Intermediate Holding III Corporation, as the borrower, certain direct and indirect subsidiaries of Holdings, the DIP Lenders from time to time party thereto and the DIP Agent.

62. "*DIP Facility*" means the $120 million superpriority senior secured debtor-in-possession loan facility to be provided to the Debtors by the DIP Lenders on the terms and conditions set forth in the DIP Facility Documents and the DIP Orders.

63. "*DIP Facility Documents*" means, collectively, the DIP Facility Credit Agreement and all other agreements, documents, and instruments delivered or entered into in connection therewith, including, but not limited to, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents.

64. "*DIP Lenders*" means the lenders party to the DIP Credit Agreement from time to time.

65. "*DIP Orders*" means, collectively, the Interim DIP Order and the Final DIP Order.

66. "*Direct Investment Shares*" means New Common Shares constituting 30% of the ERO Amount to be reserved for issuance or delivery to the ERO Backstop Parties pursuant to the ERO Documents.

67. "*Director*" means a member of the board of directors or board of managers, as applicable, of the Reorganized Parent.

68. "*Disallowed*" means, with respect to any Claim, a Claim or any portion thereof that: (a) has been disallowed by a Final Order; (b) is listed in the Schedules as zero or as contingent, disputed, or unliquidated and as to which no proof of Claim or request for payment of an Administrative Claim has been timely filed or deemed timely filed with the Court pursuant to either the Bankruptcy Code or any Final Order of the Court or otherwise deemed timely filed under applicable law or the Plan; (c) is not listed in the Schedules and as to which no proof of Claim or request for payment of an Administrative Claim has been timely filed or deemed timely filed with the Court pursuant to either the Bankruptcy Code or any Final Order of the Court or otherwise deemed timely filed under applicable law or the Plan; (d) has been withdrawn by agreement of the applicable Debtor and the Holder thereof; or (e) has been withdrawn by the Holder thereof.

69. "*Disbursing Agent*" means one or more of the Reorganized Debtors and/or any other Entity or Entities selected by the Debtors or Reorganized Debtors to make or facilitate distributions contemplated under the Plan.

70. "*Disclosure Statement*" means that certain *Disclosure Statement for the Joint Prepackaged Plan of Reorganization of United Site Services, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, dated as of the date hereof, as it may be amended, supplemented, restated, or modified from time to time, including all exhibits and schedules thereto, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law and as approved by the Court.

71.     "*Disputed*" means, with respect to a Claim, means, with respect to a Claim or Interest, a Claim or Interest, or any portion thereof, that is: (x) not Allowed and (y) not Disallowed under this Plan, the Bankruptcy Code or a Final Order, as applicable.

72.     "*Distributable New Common Shares*" means, after giving effect to the issuance or the delivery of (a) the ERO Equity, (b) the ERO Backstop Premium Shares, and (c) any equity issued (or to be reserved) pursuant to the Management Incentive Plan, one hundred percent (100%) of the remaining New Common Shares to be distributed on account of Claims on the Effective Date.

73.     "*Distribution Record Date*" means the Effective Date or such other date as determined by the Reorganized Debtors.

74.     "*DTC*" means The Depository Trust Company or any successor thereto.

75.     "*Effective Date*" means the date that is the first Business Day after the Confirmation Date, on which (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent to the occurrence of the Effective Date specified in Article IX.A have been satisfied or waived in accordance with Article IX.B; and (c) this Plan is declared effective by the Debtors. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

76.     "*Employment Agreement*" means any new and/or existing employment agreement or letter, indemnification agreement, severance agreement, or other agreement entered into with the Debtors' current and former officers or other employees by the Reorganized Debtors, in each case, consistent with the Restructuring Support Agreement.

77.     "*Entity*" means any "entity," as such term is defined in section 101(15) of the Bankruptcy Code.

78.     "*Equity Rights Offering*" means the rights offering with respect to the New Common Shares on the terms and conditions set forth in the ERO Documents and, with respect to the Rights Offering Shares backstopped by the ERO Backstop Parties on the terms and conditions set forth in the ERO Backstop Agreement.

79.     "*ERO Amount*" means an amount equal to the Initial ERO Amount less the Adjustment Determination Amount.

80.     "*ERO Backstop Agreement*" means that certain Backstop Commitment Agreement by and among USS Parent, the other Debtors and the commitment parties thereto.

81.     "*ERO Backstop Cash Premium*" has the meaning ascribed to such term in the ERO Backstop Agreement.

82.     "*ERO Backstop Order*" means the order entered by the Court approving the ERO Backstop Agreement (which may be the Confirmation Order).

83.     "*ERO Backstop Parties*" means the Entities identified as "Commitment Parties" in the ERO Backstop Agreement.

84.     "*ERO Backstop Premium*" has the meaning ascribed to such term in the ERO Backstop Agreement.

85.     "*ERO Backstop Premium Shares*" means the New Common Shares issued or delivered as the ERO Backstop Premium pursuant to the terms of the ERO Backstop Agreement.

86.     "*ERO Documents*" means, collectively, the ERO Backstop Agreement, the ERO Procedures, the ERO Backstop Order and any and all other agreements, documents, and instruments delivered or entered into in connection with the Equity Rights Offering, as approved by the Court.

87.     "*ERO Equity*" means the New Common Shares purchased through the Equity Rights Offering, consisting of the Direct Investment Shares, the Rights Offering Shares, and the Unsubscribed Equity. For the avoidance of doubt, ERO Equity does not include the Backstop Premium Shares.

88.     "*ERO Per Share Subscription Price*" means the "Per Share Subscription Price" as defined in the ERO Backstop Agreement.

89.     "*ERO Procedures*" means the procedures governing the Equity Rights Offering included in or annexed to the *Debtors' Motion for Entry of an Order (I) Scheduling a Combined Hearing to Approve the Disclosure Statement and Confirm the Plan; (II) Establishing Objection Deadlines; (III) Approving the Form and Manner of Combined Notice; (IV) Approving Solicitation Procedures and Ballots; (V) Approving Procedures for Assumption and Rejection of Executory Contracts and Unexpired Leases; (VI) Granting Preliminary Approval of Rights Offering Procedures; and (VII) Granting Related Relief*.

90.     "*Estate*" means, with respect to a particular Debtor, the estate created for such Debtor upon commencement of its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code, and the "*Estates*" means every Debtor's Estate, collectively.

91.     "*Exculpated Parties*" means, collectively, and in each case in their capacity as such, (i) the Debtors, (ii) the Reorganized Debtors, (iii) with respect to each of the foregoing, their current and former directors, managers, officers, attorneys, financial advisors, consultants or other professionals or advisors that served in such capacity between the Petition Date and the Effective Date, and (iv) the Professionals retained by the Debtors in the Chapter 11 Cases.

92.     "*Executory Contract*" means a contract to which one or more of the Debtors are party, which is subject to assumption or rejection in accordance with section 365 or 1123 of the Bankruptcy Code.

93.     "*Existing Equity*" means all Interests in USS Parent.

94.     "*Exit ABL Facility*" means a new asset-based lending facility to be made available to the Reorganized Debtors on the Effective Date on the terms set forth in the Exit ABL Facility Term Sheet.

95.     "*Exit ABL Facility Agent*" means the Entity acting as administrative and collateral agent under the Exit ABL Facility Documents.

96.     "*Exit ABL Facility Documents*" means any documents governing the Exit ABL Facility and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith. The material Exit ABL Facility Documents included in the Plan Supplement shall be consistent with the terms set forth in the Exit ABL Facility Term Sheet and otherwise in form and substance reasonably acceptable to the Exit ABL Facility Lenders.

97.     "*Exit ABL Facility Lenders*" means the banks, financial institutions, and lenders from time to time party to the Exit ABL Facility Documents.

98.     "*Exit ABL Facility Parties*" means, collectively, the Exit ABL Facility Lenders and the Exit ABL Facility Agent.

99.     "*Exit ABL Facility Term Sheet*" means the term sheet regarding the Exit ABL Facility attached to the Restructuring Support Agreement and disclosed in the Plan Supplement.

100.    "*Exit RCF Facility*" means a new revolving credit facility to be made available to the Reorganized Debtors on the Effective Date on the terms set forth in the Exit RCF Facility Term Sheet attached to the Restructuring Support Agreement and disclosed in the Plan Supplement.

101.    "*Exit RCF Facility Agent*" means the administrative and collateral agent, in its capacities as such, under the Exit RCF Facility Documents.

102.    "*Exit RCF Facility Credit Agreement*" means the credit agreement governing the Exit RCF Facility.

103.    "*Exit RCF Facility Documents*" means the Exit RCF Facility Credit Agreement, collateral documents, Uniform Commercial Code financing statements, and other loan documents governing the Exit RCF Facility. The material Exit RCF Facility Documents included in the Plan Supplement shall be consistent with the terms set forth in the Exit RCF Facility Term Sheet and otherwise in form and substance reasonably acceptable to the Exit RCF Facility Lenders.

104.    "*Exit RCF Facility Lenders*" means the banks, financial institutions, and lenders from time to time party to the Exit RCF Facility Documents.

105.    "*Exit RCF Facility Parties*" means, collectively, the Exit RCF Facility Lenders and the Exit RCF Facility Agent.

106.    "*Exit RCF Facility Term Sheet*" means the term sheet regarding the Exit RCF Facility attached to the Restructuring Support Agreement and disclosed in the Plan Supplement.

107.    "*Exit Term Loan Facility*" means that certain first lien term loan credit facility to be entered into by the Reorganized Debtors on the Effective Date on such terms as set forth in the Exit Term Loan Facility Term Sheet.

108. "*Exit Term Loan Facility Agent*" means the administrative and collateral agent, in its capacities as such, under the Exit Term Loan Facility Documents.

109. "*Exit Term Loan Facility Credit Agreement*" means the credit agreement governing the Exit Term Loan Facility.

110. "*Exit Term Loan Facility Documents*" means the Exit Term Loan Facility Credit Agreement, collateral documents, Uniform Commercial Code financing statements, and other loan documents governing the Exit Term Loan Facility.

111. "*Exit Term Loan Facility Lenders*" means the banks, financial institutions, and lenders party to the Exit Term Loan Facility Documents.

112. "*Exit Term Loan Facility Term Sheet*" means the term sheet regarding the Exit Term Loan Facility attached to the Restructuring Support Agreement.

113. "*Exit Term Loan Parties*" means, collectively, the Exit Term Loan Facility Agent and the Exit Term Loan Facility Lenders.

114. "*Final DIP Order*" means one or more Final Orders entered approving the DIP Facility and authorizing the Debtors' use of cash collateral.

115. "*Final Order*" means, as applicable, an order or judgment of the Court, or other court of competent jurisdiction with respect to the relevant subject matter, that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing has been timely taken; or as to which, any appeal that has been taken or any petition for certiorari that has been or may be filed has been withdrawn with prejudice, resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought, or the new trial, reargument, or rehearing has been denied, resulted in no stay pending appeal or modification of such order, or has otherwise been dismissed with prejudice; *provided* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, the local rules of the Court or applicable non-bankruptcy law, may be filed with respect to such order will not preclude such order from being a Final Order.

116. "*First Lien Funded Debt Claims*" means, collectively, the First-Out Revolving Loans Claims, the First-Out Notes Claims, the First-Out Term Loans Claims, the Second-Out Claims, the Third-Out Claims, and the Amended Term Loan Claims.

117. "*First Lien Secured Claims*" means, collectively, the Second-Out Claims that are Secured and the Amended Term Loan Claims that are Secured.

118. "*First Lien Secured Claims Recovery*" means Cash in the amount of $419,485,424.

119. "*First-Out Claim*" means, the First-Out Revolving Loans Claims, the First-Out Term Loans Claims, and the First-Out Notes Claims.

120.    "*First-Out Notes*" means those certain floating rate senior secured notes due 2030 issued by Vortex Opco, LLC pursuant to the First-Out Notes Documents.

121.    "*First-Out Notes Claims*" means any Claims arising under, derived from, based upon or related to the First-Out Notes Documents (including all "Obligations" as defined in the First-Out Notes Indenture).

122.    "*First-Out Notes Documents*" means, collectively, the First-Out Notes Indenture and all other agreements, documents, and instruments delivered or entered into in connection therewith, including, but not limited to, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents.

123.    "*First-Out Notes Indenture*" means that certain Indenture dated as of September 3, 2024 (as may be modified, supplemented or amended) among Vortex Opco, LLC, as issuer, the guarantors from time to time party thereto and the First-Out Notes Trustee.

124.    "*First-Out Notes Trustee*" means Wilmington Trust, National Association, or any successor, in its capacity as trustee and notes collateral agent under the First-Out Notes Documents.

125.    "*First-Out Revolving Loans*" has the meaning ascribed to "Revolving Loans" in the First-Out/Second-Out Credit Agreement.

126.    "*First-Out Revolving Loans Claims*" means all Claims arising under, derived from, based upon or related to the First-Out/Second-Out Documents in respect of the First-Out Revolving Loans, "Revolving Commitments" (as defined in the First-Out/Second-Out Credit Agreement) or "Letters of Credit" (as defined in the First-Out/Second-Out Credit Agreement), including, without limitation, all "Obligations" (as defined in the First-Out/Second-Out Credit Agreement) on account of the foregoing.

127.    "*First-Out Term Loans*" has the meaning ascribed to "First-Out Term Loans" in the First-Out/Second-Out Credit Agreement.

128.    "*First-Out Term Loans Claims*" means all Claims arising under, derived from, based upon, or related to the First-Out/Second-Out Documents (including all "Obligations" as defined in the First-Out/Second-Out Credit Agreement) in respect of First-Out Term Loans.

129.    "*First-Out Term Loans/Notes Claims*" means, collectively, the First-Out Term Loans Claims and the First-Out Notes Claims.

130.    "*First-Out/Second-Out Agent*" means Bank of America, N.A., or any successor, in its capacity as administrative agent and collateral agent under the First-Out/Second-Out Documents.

131.    "*First-Out/Second-Out Credit Agreement*" means that certain Credit Agreement dated as of August 22, 2024, among USS Parent, as Existing Holdings, PECF USS Intermediate Holding III Corporation., as existing borrower, Vortex Holdco, LLC, as Holdings, Vortex Opco,

LLC as borrower, various lenders party thereto from time to time, and the First-Out/Second-Out Agent.

132.    "*First-Out/Second-Out Documents*" means, collectively, the First-Out/Second-Out Credit Agreement and all other agreements, documents, and instruments delivered or entered into in connection therewith, including, but not limited to, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents.

133.    "*First-Out/Second-Out Loans*" means the First-Out Term Loans, First-Out Revolving Loans, and Second-Out Term Loans.

134.    "*General Unsecured Claim*" means any Unsecured Claim other than: (a) an Administrative Claim, (b) a Priority Tax Claim, (c) a Priority Non-Tax Claim, (d) an Intercompany Claim, or (e) an Unsecured Funded Debt Claim.

135.    "*Governance Term Sheet*" means the governance term sheet attached to the Restructuring Support Agreement as Exhibit I.

136.    "*Governmental Unit*" means any "governmental unit," as such term is defined in section 101(27) of the Bankruptcy Code.

137.    "*Holder*" means an Entity holding a Claim against or an Interest in any Debtor, as applicable.

138.    "*Impaired*" means, with respect to a Claim, Interest, or a Class of Claims or Interests, "impaired" within the meaning of section 1124 of the Bankruptcy Code.

139.    "*Indemnification Provisions*" means each of the Debtors' indemnification provisions in effect as of the Petition Date, whether in the Debtors' memoranda and articles of association, bylaws, certificates of incorporation, other formation documents, board resolutions, management or indemnification agreements, employment contracts, or otherwise providing a basis for any obligation of a Debtor to indemnify, defend, reimburse, or limit the liability of, or to advances fees and expenses to, any of the Debtors' current and former directors, officers, direct and indirect equity holders, managers, members, employees, accountants, investment bankers, attorneys, other professionals, and professionals of the Debtors, and such current and former directors', officers', and managers' respective Affiliates, each of the foregoing solely in their capacity as such.

140.    "*Initial ERO Amount*" means $480 million.

141.    "*Insurance Policies*" means all insurance policies that have been issued (or provide coverage) at any time to the Debtors or any of their predecessors, and all agreements, documents, or instruments relating thereto, including any D&O Policies and workers' compensation.

142.    "*Insurer*" means any insurance company or third-party administrator that issued or entered into an Insurance Policy and any respective predecessors and/or affiliates thereof.

143. "*Intercompany Claim*" means any Claim held by a Debtor against another Debtor, including the Intercompany Credit Agreement Claims.

144. "*Intercompany Credit Agreement*" means that certain Credit Agreement, dated as of August 22, 2024, among USS Parent, as holdings, PECF USS Intermediate Holding III Corporation, as borrower, the lenders party thereto, and the Intercompany Credit Agreement Agent.

145. "*Intercompany Credit Agreement Agent*" means Wilmington Savings Fund Society, FSB, or any successor, in its capacity as administrative agent and collateral agent under the Intercompany Credit Agreement.

146. "*Intercompany Credit Agreement Claims*" means all Claims on account of Intercompany Credit Agreement Loans.

147. "*Intercompany Credit Agreement Documents*" means, collectively, the Intercompany Credit Agreement and all other agreements, documents, and instruments delivered or entered into in connection therewith, including, but not limited to, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents.

148. "*Intercompany Credit Agreement Loans*" means those certain term loans extended in accordance with the Intercompany Credit Agreement.

149. "*Intercompany Interest*" mean any Interest held by a Debtor in another Debtor.

150. "*Intercreditor Agreements*" means, collectively, (i) the ABL Intercreditor Agreement, (ii) the 2024 First Lien Intercreditor Agreement, (iii) the Intercreditor and Subordination Agreement, and (iv) Section 11.12 of the First-Out/Second-Out Credit Agreement.

151. "*Intercreditor and Subordination Agreement*" means that certain Intercreditor and Subordination Agreement, dated as of August 22, 2024, by and among the collateral agents under each of the 2024 First Lien Facilities.

152. "*Interest*" means any equity security (as defined in Bankruptcy Code section 101(16)) in any Debtor and any shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Debtor and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into, or which are exercisable or exchangeable for, the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor, including equity or equity-based incentives, grants or other instruments issued, granted or promised to be granted to current or former employees, directors, officers, consultants or contractors of any Debtor (in each case whether or not arising under or in connection with any employment agreement, separation agreement, or employee incentive plan or program of a Debtor as of the Petition Date and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or similar security)."Interest" includes Existing Equity Interests.

153.    "*Interim DIP Order*" means the Court order approving the DIP Facility and authorizing use of cash collateral on an interim basis pending entry of the Final DIP Order.

154.    "*Lien*" means a "lien" as such term is defined in section 101(37) of the Bankruptcy Code.

155.    "*Management Incentive Plan*" means a management incentive plan providing for the issuance from time to time, of equity and equity-based awards with respect to New Common Shares, to be established and implemented by the Reorganized Parent Board, which shall provide for a pool of 8% of the New Common Shares (on a fully diluted basis), as of the Effective Date, reserved for issuance under the Management Incentive Plan.

156.    "*New Boards*" means, collectively, the Reorganized Parent Board and New Subsidiary Boards.

157.    "*New Common Shares*" means the common equity of Reorganized Parent.

158.    "*New Organizational Documents*" means the new bylaws, certificates of incorporation, certificates of formation, limited liability company agreements, operating agreements, certificates of limited partnership, agreements of limited partnership, shareholders agreement, a Registration Rights Agreement or such other organizational documents of the Reorganized Debtors, the forms of which shall be included in the Plan Supplement.

159.    "*New Subsidiary Boards*" means the initial board of directors or managers (as applicable) for the Reorganized Debtors (other than the Reorganized Parent), as appointed pursuant to Article IV.I.

160.    "*Notice of Entry of Confirmation Order*" means a notice to be sent by the Reorganized Debtors following the entry of the Confirmation Order stating that the Court has confirmed the Plan and providing such other information as required by the Confirmation Order.

161.    "*Other Secured Claim*" means any Secured Claim other than an Administrative Claim, DIP Claim, Priority Claim, ABL Facility Claim, First-Out Claim, Amended Term Loan Claim, Second-Out Claim, and Intercompany Credit Agreement Claim.

162.    "*PECF USS Holding Corporation's Equity Owner*" means such Entities, funds or investment vehicles that own the equity interests in PECF USS Holding Corporation.

163.    "*PECF USS Holding Corporation's Equity Owner Consideration*" means $5.5 million in Cash.

164.    "*Person*" means a "person" as such term is defined in section 101(41) of the Bankruptcy Code.

165.    "*Petition Date*" means the date on which the Debtors commence the Chapter 11 Cases.

166.    "*Plan Effective Date Projected Liquidity*" has the meaning ascribed to such term in the ERO Backstop Agreement.

167.    "*Plan Equity Value*" means $725 million.

168.    "*Plan*" has the meaning specified in the Introduction hereto.

169.    "*Plan Supplement*" means the compilation of documents (or forms thereof), agreements, schedules, and exhibits to the Plan to be filed no later than seven (7) days prior to the deadline to object to Confirmation or such later date as may be approved by the Court, as each may be amended, supplemented, or modified from time to time prior to the occurrence of the Effective Date in accordance with the Plan, Restructuring Support Agreement (including the consent rights therein), Bankruptcy Code, and Bankruptcy Rules, and which may include: (a) the New Organizational Documents, including the Governance Term Sheet; (b) a list of the members of the New Boards (to the extent known); (c) the Exit Term Loan Facility Documents; (d) the Restructuring Transactions Memorandum, (e) the Schedule of Retained Causes of Action; (f) the Schedule of Rejected Executory Contracts and Unexpired Leases (if any); (g) the Exit ABL Facility Documents; (h) the ERO Documents; (i) Exit RCF Facility Documents; and (j) such other documents as are necessary or advisable to implement the Restructuring contemplated by the Restructuring Support Agreement and the Plan, each of which shall be consistent with the Restructuring Support Agreement and the consent rights set forth therein.

170.    "*Priority Claim*" means any Priority Non-Tax Claim or Priority Tax Claim.

171.    "*Priority Non-Tax Claim*" means any Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than an Administrative Claim, DIP Claim, or Priority Tax Claim.

172.    "*Priority Tax Claim*" means any Claim of a Governmental Unit entitled to priority pursuant to section 502(i) or 507(a)(8) of the Bankruptcy Code.

173.    "*Pro Rata*" means the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of all Allowed Claims or Interests in that Class.

174.    "*Professional*" means an Entity: (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been allowed by the Court pursuant to section 503(b)(4) of the Bankruptcy Code.

175.    "*Professional Fee Claim*" means a Claim by a Professional seeking an award of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

176.    "*Professional Fee Escrow Account*" means an interest-bearing account in an amount equal to the total Professional Fee Escrow Amount funded by the Reorganized Debtors on the Effective Date.

177.    "*Professional Fee Escrow Amount*" means the aggregate amount of unpaid Professional Fee Claims that the Professionals estimate in good faith they have incurred or will incur in rendering services in the Chapter 11 Cases through and including the Effective Date, which estimates the Professionals shall deliver to the Debtors as set forth in Article II.B of this Plan.

178.    "*Reinstate*" means with respect to Claims or Interests, that the Claim or Interest shall have been rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code. "Reinstated" and "Reinstatement" shall have correlative meanings.

179.    "*Registration Rights Agreement*" means a registration rights agreement or provisions in the New Organizational Documents of Reorganized Parent that will provide certain registration rights and which shall be consistent with the Governance Term Sheet and filed as part of the Plan Supplement.

180.    "*Related Parties*" means, collectively, with respect to any Entity, in each case solely in its capacity as such with respect to such Entity, such Entity's current and former directors, managers, officers, shareholders, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by operation of law or otherwise), subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, fiduciaries, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, other representatives, restructuring advisors, and other professionals and advisors, and any such person's or Entity's respective predecessors, successors, assigns, heirs, executors, estates, and nominees; *provided*, *however*, for the avoidance of doubt, any Affiliates of any Revolving Credit Lender, or any funds or accounts managed by BlackRock Financial Management, Inc., BlackRock Advisors, LLC, BlackRock Fund Advisors, BlackRock Capital Investment Advisors, LLC or their Related Parties (collectively, the "***BlackRock Creditors***"), that are signatories to the Restructuring Support Agreement (which, for purposes of this proviso, shall include any separate trading desk, fund, account, branch unit and/or business group of a Revolving Credit Lender or a BlackRock Creditor) shall not be deemed to be a Related Party of such Revolving Credit Lender or such BlackRock Creditor or a Revolving Credit Lender or a BlackRock Creditor itself, unless such Affiliate has itself submitted a Ballot or specifically authorized a third party to submit a Ballot on its behalf.

181.    "*Released Parties*" means, collectively, and in each case solely in their capacity as such, (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Consenting Stakeholders, (iv) each of the First-Out Notes Trustee, the First-Out/Second-Out Agent, the ABL Agent, and the Intercompany Credit Agreement Agent, (v) the DIP Agent and the DIP Lenders, (vi) the Exit Term Loan Parties, (vii) the Exit RCF Facility Parties, (viii) the Exit ABL Facility Parties, (ix) the ERO Backstop Parties, (x) the Sponsor, and (xi) each Related Party of each of the foregoing Persons in clauses (i) through (x); *provided*, *however*, that any Holder of a Claim or Interest that (x) files an objection to the Plan, (y) opts out of the Third-Party Release, or (z) is listed in the Retained Causes of Action Schedule, as applicable, shall not be a "Released Party"; *provided further*, *however*, that notwithstanding the preceding proviso, any Holder of a Claim or Interest that is party to or has

otherwise signed the Restructuring Support Agreement shall be a Released Party and Releasing Party for all purposes under the Plan.

182. "*Releases*" has the meaning ascribed to such term in Article VIII.E.

183. "*Releasing Parties*" means, collectively, and in each case in their capacity as such, (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Consenting Stakeholders, (iv) each of the First-Out Notes Trustee, the First-Out/Second-Out Agent, the ABL Agent, and the Intercompany Credit Agreement Agent, (v) the DIP Agent and the DIP Lenders, (vi) the Exit Term Loan Parties, (vii) the Exit ABL Facility Parties and Exit RCF Facility Parties, (viii) the ERO Backstop Parties, (ix) the Sponsor, (x) each Related Party of each of the foregoing Persons in clauses (i) through (ix), (xi) the Holders of Claims or Interests who vote to accept the Plan and who do not affirmatively opt out of the Third-Party Release, (xii) the Holders of Claims or Interests that are deemed to accept the Plan and who do not affirmatively opt out of the Third-Party Release, (xiii) the Holders of Claims or Interests who abstain from voting on the Plan and who do not affirmatively opt out of the Third-Party Release, (xiv) the Holders of Claims or Interests who are deemed to reject the Plan and who do not affirmatively opt out of the Third-Party Release, and (xv) the Holders of Claims or Interests who vote to reject the Plan and who do not affirmatively opt out of the Third-Party Release; *provided* that each Holder of Claims or Interests that is party to or has otherwise signed the Restructuring Support Agreement shall not opt out of the Third-Party Releases. For the avoidance of doubt, unless expressly indicated on a Ballot voting to accept the Plan, the Revolving Credit Lenders participating in this Plan are doing so only in their capacity as holders of First-Out Revolving Loans Claims or ABL Facility Claims as of the Petition Date, and any actions taken by the Revolving Credit Lenders in connection with the Plan and the Restructuring Transactions as well as any releases provided in connection with the Plan are only with respect to such lender's interest in the First-Out Revolving Loans Claims or ABL Facility Claims that are now owned or subsequently acquired by the Revolving Credit Lenders. In addition, the provisions of this Plan shall only apply to such trading desk(s), fund(s), account, branch, unit and/or business group(s) that have a beneficial interest in such Claim and shall not apply to any other trading desk(s), fund(s), account, branch, unit and/or business group(s) of the Revolving Credit Lenders, which, so long as they are not acting at the direction of or for the benefit of such Revolving Credit Lender or such Revolving Credit Lender's investment in the Debtor, will not be considered "Releasing Parties" under the Plan.

184. "*Reorganized Debtors*" means the Debtors as reorganized pursuant to and under the Plan, on and after the Effective Date, or any successors or assigns thereto including by merger, consolidation, or otherwise, and including any new entity established in connection with the implementation of the Restructuring Transactions, including, for the avoidance of doubt, Reorganized Parent.

185. "*Reorganized Parent*" means, PECF USS Holding Corporation or such other Entity as determined in accordance with Article IV.C.4 of this Plan.

186. "*Reorganized Parent Board*" means the initial board of directors of Reorganized Parent, as appointed pursuant to Article IV.I and the New Organizational Documents.

187.    "*Required Consenting Second-Out Creditors*" has the meaning ascribed to such term in the Restructuring Support Agreement.

188.    "*Required ERO Backstop Parties*" has the meaning ascribed to "Required Commitment Parties" in the ERO Backstop Agreement.

189.    "*Restructuring*" has the meaning ascribed to such term in the Restructuring Support Agreement.

190.    "*Restructuring Expenses*" means (a) "Restructuring Expenses" as defined in the Restructuring Support Agreement and (b) following the succession of the Third-Out Notes Trustee and the Unsecured Notes Trustee roles to BOKF N.A. (the "***Successor Trustee***"), the reasonable and documented fees and expenses of the Successor Trustee, other than any fees or expenses incurred directly or indirectly for any Prohibited Action (as defined in the DIP Orders) or in furtherance of any claims or Causes of Action to challenge or oppose in any way the Restructuring Support Agreement or Confirmation of the Plan, in an aggregate amount not to exceed $200,000.

191.    "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, dated as of December 28, 2025, by and among the Debtors and the Consenting Stakeholders, together with all exhibits and schedules thereto, as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms.

192.    "*Restructuring Transactions*" has the meaning set forth in the Restructuring Support Agreement.

193.    "*Restructuring Transactions Memorandum*" means a summary description of the Restructuring Transactions, including as described in Article IV.B to be included in the Plan Supplement that will set forth the material transactions required to effectuate the Restructuring, including any "tax steps memorandum" or other document describing the steps to be taken in connection with such restructuring transactions, in each case, in accordance with the Restructuring Support Agreement and consistent with the other Definitive Documents.

194.    "*Revolving Credit Facilities Documents*" means the First-Out/Second-Out Credit Agreement and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, and other security documents, as amended, supplemented, or modified from time to time, as applicable to the First-Out Revolving Loans.

195.    "*Revolving Credit Lenders*" means the banks and other financial institutions or entities holding (i) First-Out Revolving Loans under the First-Out/Second-Out Credit Agreement, and/or (ii) ABL Revolving Loans under the ABL Facility Credit Agreement, as applicable.

196.    "*Rights Offering Shares*" means New Common Shares constituting 70% of the ERO Amount.

197.    "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule (if any) of Executory Contracts and Unexpired Leases to be rejected by the applicable Debtors as of the Effective Date, as set forth in the Plan or Plan Supplement.

198.    "*Schedule of Retained Causes of Action*" means a schedule of Causes of Action of the Debtors that are not released, waived, or transferred pursuant to this Plan, as the same may be amended, modified, or supplemented from time to time, which, for the avoidance of doubt, shall not include any Causes of Action that are settled, released, or exculpated under this Plan.

199.    "*Schedules*" means, collectively, the schedules of assets and liabilities, statements of financial affairs, lists of Holders of Claims and Interests and all amendments or supplements thereto filed by the Debtors with the Court.

200.    "*Second-Out Claims*" means all Claims arising under, derived from, based upon, or related to the First-Out/Second Out Documents (including all "Obligations" as defined in the First-Out/Second-Out Credit Agreement) in respect of the Second-Out Term Loans.

201.    "*Second-Out Deficiency Claims*" means all unsecured deficiency Claims arising from or related to the First-Out/Second-Out Documents in respect of the Second-Out Term Loans, which shall be Allowed in an amount equal to $1,469,610,404.

202.    "*Second-Out Term Loans*" has the meaning ascribed to "Second-Out Term Loans" in the First-Out/Second-Out Credit Agreement.

203.    "*Secured*" means, as to a Claim, any Claim that is secured by a Lien on property in which any Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Court order, or subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the applicable creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff as determined pursuant to section 506(a) of the Bankruptcy Code.

204.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, together with the rules and regulations promulgated thereunder.

205.    "*Sponsor*" means those affiliates and investment funds managed by Platinum Equity Advisors, LLC or its affiliates that are direct or indirect Holders of Existing Equity Interests. For the avoidance of doubt, "Sponsor" includes PECF USS Holding Corporation and PECF USS Intermediate Holding Corporation.

206.    "*Subordinated Claim*" means any Claim that is subject to subordination in accordance with sections 510(b)-(c) of the Bankruptcy Code or otherwise.

207.    "*Subscription Rights*" means the rights to participate in the Equity Rights Offering provided to eligible record Holders of Allowed First Lien Secured Claims consistent with the ERO Documents and to subscribe for the Rights Offering Shares.

208.    "*Target Liquidity*" means $150 million.

209.    "*Third-Out Claims*" means all Claims arising under, derived from, based upon, or related to the Third-Out Notes Documents (including all "Obligations" as defined in the Third-Out Notes Indenture).

210. "*Third-Out Notes*" means those certain 8.000% senior secured notes due 2030 issued by Vortex Opco, LLC pursuant to the Third-Out Notes Documents.

211. "*Third-Out Notes Documents*" means, collectively, the Third-Out Notes Indenture and all other agreements, documents, and instruments delivered or entered into in connection therewith, including, but not limited to, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents.

212. "*Third-Out Notes Indenture*" means that certain Indenture dated as of August 22, 2024 (as may be modified, supplemented or amended) among Vortex Opco, LLC, as issuer, the guarantors from time to time party thereto and the Third-Out Notes Trustee.

213. "*Third-Out Notes Trustee*" means Wilmington Trust, National Association, or any successor, in its capacity as trustee and notes collateral agent under the Third-Out Notes Documents.

214. "*Third-Party Release*" has the meaning ascribed to such term in Article VIII.E.

215. "*U.S. Trustee*" means the Office of the United States Trustee for Region 3.

216. "*Unexpired Lease*" means a lease to which one or more of the Debtors are party, which is subject to assumption or rejection in accordance with section 365 of the Bankruptcy Code.

217. "*Unimpaired*" means, with respect to a Class, Claim, Interest, or a Holder of a Claim or Interest, that such Class, Claim, Interest, or Holder is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

218. "*Unsecured Claim*" means any Claim that is not a Secured Claim, other than an Administrative Claim, Priority Claim, or Intercompany Claim.

219. "*Unsecured Funded Debt Claim Recovery*" means Cash in the amount of $5,000,000.

220. "*Unsecured Funded Debt Claims*" means, collectively, the (i) Second-Out Deficiency Claims, (ii) Amended Term Loan Deficiency Claims, (iii) Third-Out Claims, and (iv) Amended Unsecured Notes Claims.

221. "*Unsubscribed Equity*" has the meaning ascribed to the term "Rights Offering Backstop Shares" in the ERO Backstop Agreement.

222. "*USS Parent*" means PECF USS Intermediate Holding II Corporation.

223. "*Voting Record Date*" means December 22, 2025.

B.    *Rules of Interpretation*

For purposes of the Plan and unless otherwise specified herein: (1) each term, whether stated in the singular or the plural, shall include, in the appropriate context, both the singular and the plural; (2) each pronoun stated in the masculine, feminine, or neuter gender shall include, in the appropriate context, the masculine, feminine, and the neuter gender; (3) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (4) all references to articles or Articles are references to the Articles hereof; (5) all captions and headings are inserted for convenience of reference only and are not intended to be a part of, or to affect the interpretation of, the Plan; (6) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (7) any reference to an existing document, schedule, or exhibit, whether or not filed, having been filed, or to be filed, shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented; (8) any reference to an event occurring on a specified date, including on the Effective Date, shall mean that the event will occur on that date or as soon thereafter as reasonably practicable; (9) any reference to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions except as specifically provided herein; *provided* that nothing in this clause (9) shall affect any parties' consent rights over any of the Definitive Documents or any amendments thereto as provided for in the Restructuring Support Agreement; (10) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time and as applicable to the Chapter 11 Cases; (11) subject to the provisions of any contract, charter, limited liability company agreements, operating agreements, certificates of incorporation, bylaws, instrument, release, or other agreement or document created or entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with, the applicable law, including the Bankruptcy Code and Bankruptcy Rules; (12) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (13) any reference to a predecessor or predecessor of a Person in this Plan refers to and includes both immediate predecessors and any predecessors of a predecessor, except as may otherwise be clearly and expressly stated; (14) all references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided; (15) except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires; and (16) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

C.    *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may or shall occur pursuant to the Plan is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.    *Governing Law*

Unless federal law (including the Bankruptcy Code and Bankruptcy Rules) is applicable, and unless specifically stated otherwise, the laws of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the laws of another jurisdiction, shall govern the rights, obligations, construction, and implementation of the Plan and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided*, *however*, that corporate or entity governance matters relating to the Debtors or the Reorganized Debtors shall be governed by the laws of the state of incorporation or organization of the relevant Debtor or Reorganized Debtor, as applicable.

E.    *Controlling Document*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order). In the event of an inconsistency between the Confirmation Order and the Plan or the Disclosure Statement, the Confirmation Order shall control.

F.    *Consultation, Information, Notice, and Consent Rights.*

Notwithstanding anything herein to the contrary, any and all consultation, information, notice, and consent rights of the parties to the Restructuring Support Agreement and the ERO Backstop Agreement (pursuant to the ERO Backstop Order) set forth therein (including the exhibits thereto) with respect to the form and substance of the Plan, all exhibits to the Plan, and all other Definitive Documents or other documents with respect to the implementation of the Plan and the Restructuring Transactions, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A hereto) and fully enforceable as if stated in full herein.

Failure to reference the rights referred to in the immediately preceding paragraph as such rights relate to any document referenced in the Restructuring Support Agreement (including the exhibits thereto) shall not impair such rights and obligations.

## ARTICLE II
## ADMINISTRATIVE CLAIMS AND OTHER UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, DIP Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III.

A.    *Administrative Claims*

Except with respect to the Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of the Judicial Code, DIP Claims and Restructuring

Expenses, and unless otherwise agreed by the Holder of an Allowed Administrative Claim and the applicable Debtor, each Holder of an Allowed Administrative Claim shall receive, in full satisfaction of its Allowed Administrative Claim, Cash equal to the Allowed amount of such Administrative Claim in accordance with the following: (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than sixty (60) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business, after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Court. For the avoidance of doubt, Holders of Administrative Claims shall not be required to file a request for payment with the Court.

B.     *Professional Fee Claims*

1.     Final Fee Applications

All final requests for payment of Professional Fee Claims incurred prior to the Effective Date must be filed with the Court and served on the Reorganized Debtors, the U.S. Trustee, the Committee, if any, and all other parties that have requested notice in these Chapter 11 Cases by no later than 45 days after the Effective Date, unless the Reorganized Debtors agree otherwise in writing. Objections to Professional Fee Claims must be filed with the Court and served on the Reorganized Debtors and the applicable Professional within 21 days after the filing of the final fee application with respect to the applicable professional fees. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and any prior orders of the Court in the Chapter 11 Cases, the Allowed amounts of such Professional Fee Claims shall be determined by the Court and, once approved by the Court, shall be promptly paid in full in Cash from the Professional Fee Escrow Account; *provided*, *however*, that if the funds in the Professional Fee Escrow Account are insufficient to pay in full all Allowed Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A of the Plan. Following the Effective Date, any provision of the Interim Compensation Order requiring Professionals to file an interim fee application shall be waived.

For the avoidance of doubt, the immediately preceding paragraph shall not affect any professional-service Entity that is permitted to receive, and the Debtors are permitted to pay without seeking further authority from the Court, compensation for services and reimbursement of expenses in the ordinary course of the Debtors' businesses (and in accordance with any relevant prior order of the Court authorizing the payment of professionals providing ordinary course services), which payments may continue notwithstanding the occurrence of Confirmation and Consummation.

2.      Professional Fee Escrow Account

Each Professional shall, in good faith, estimate its unpaid Professional Fee Claims as of the Effective Date and deliver its estimate to the Debtors' counsel no later than three (3) Business Days before the anticipated Effective Date. No Professional's estimate shall be deemed a limit on the amount of its Professional Fee Claims that is ultimately Allowed. If a Professional does not provide an estimate, the Debtors may themselves estimate the unpaid and unbilled fees and expenses of such Professional as of the anticipated Effective Date for purposes of funding the Professional Fee Escrow Account.

No later than the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall fund the Professional Fee Escrow Account in an amount in Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Court have been irrevocably paid in full in Cash pursuant to one or more Final Orders. No Liens, claims, interests, or other encumbrances shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. The funds held in the Professional Fee Escrow Account shall not be property of the Debtors, their Estates, the Reorganized Debtors, or any of their respective Affiliates. Any funds remaining in the Professional Fee Escrow Account after all final applications for Professional Fee Claims have been resolved by Final Order and all Allowed Professional Fee Claims have been irrevocably paid in Cash, shall revert to the Reorganized Debtors.

3.      Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Court, promptly pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors on and after the Effective Date. On the Effective Date, any requirement that Professionals comply with sections 327 through 331 or 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order or approval of the Court.

C.      *DIP Claims*

All DIP Claims shall be deemed Allowed as of the Effective Date in an amount equal to (1) the principal amount outstanding under the DIP Facility on such date, (2) all interest accrued thereon to the date of payment (including interest accrued through the Effective Date) and unpaid, and (3) all accrued and unpaid fees, expenses, and non-contingent indemnification obligations payable under the DIP Facility Documents and the DIP Orders.

On the Effective Date, except to the extent a Holder has agreed to alternative treatment, in full and final satisfaction, settlement, release, discharge of, and in exchange for, each Allowed DIP Claim, each Holder of an Allowed DIP Claim shall receive payment in full in Cash of its Allowed DIP Claim.

D.     *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, on the Effective Date or as soon as practicable thereafter, each Holder of such Allowed Priority Tax Claim shall receive Cash in an amount equal to such Allowed Priority Tax Claim or other treatment in a manner consistent with the terms set forth in section 1129(a)(9) of the Bankruptcy Code.

E.     *Restructuring Expenses*

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms set forth in the Restructuring Support Agreement and ERO Backstop Agreement (pursuant to the ERO Backstop Order, without the requirement to file a fee application with the Court or for Court review and approval. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least three (3) Business Days before the anticipated Effective Date; *provided*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses (it being understood that any difference in (a) estimated Restructuring Expenses on and including the Effective Date as compared to (b) Restructuring Expenses actually incurred on and including the Effective Date shall be reconciled following the submission of a final invoice by the relevant Entity following the Effective Date). In addition, on and after the Effective Date, the Reorganized Debtors shall continue to pay, when due and payable in the ordinary course, pre- and post-Effective Date Restructuring Expenses relating to implementation of the Plan and Consummation thereof without any requirement for review or approval by the Court or for any party to file a fee application with the Court, but subject to the terms of any applicable engagement or fee letter.

## ARTICLE III
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.     *Classification of Claims and Interests*

Except for the Claims addressed in Article II hereof, all Claims and Interests are classified in the Classes set forth in this Article III. A Claim or Interest, or any portion thereof, is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest, as applicable, in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

This Plan constitutes a separate Plan for each of the Debtors, and the classification of Claims and Interests shall apply separately to each Debtor. All of the potential Classes for the Debtors are set forth herein. Such groupings shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change

of control of any Debtor for any purpose, cause a merger or consolidation of any legal Entities, or cause the transfer of any assets, and, except as otherwise provided by or permitted under this Plan, all Debtors shall continue to exist as separate legal Entities after the Effective Date.

The classification of Claims against and Interests in the Debtors is set forth below.

| Class | Claims or Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| 1 | Priority Non-Tax Claims | Unimpaired | Not entitled to vote / Presumed to accept |
| 2 | Other Secured Claims | Unimpaired | Not entitled to vote / Presumed to accept |
| 3 | ABL Facility Claims | Unimpaired | Not entitled to vote / Presumed to accept |
| 4 | First-Out Revolving Loans Claims | Unimpaired | Not entitled to vote / Presumed to accept |
| 5 | First-Out Term Loan/Notes Claims | Unimpaired | Not entitled to vote / Presumed to accept |
| 6 | First Lien Secured Claims | Impaired | Entitled to vote |
| 7 | Unsecured Funded Debt Claims | Impaired | Entitled to vote |
| 8 | General Unsecured Claims | Unimpaired | Not entitled to vote / Presumed to accept |
| 9 | Intercompany Claims | Either Unimpaired or Impaired | Either conclusively presumed to accept / not entitled to vote or deemed to have rejected / not entitled to vote |
| 10 | Intercompany Interests | Either Unimpaired or Impaired | Either conclusively presumed to accept / not entitled to vote or deemed to have rejected / not entitled to vote |
| 11 | Existing Equity Interests | Impaired | Not entitled to vote / Deemed to reject |
| 12 | Subordinated Claims | Impaired | Not entitled to vote / Deemed to reject |

B.   *Treatment of Claims and Interests*

Subject to Article VII hereof, each holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such holder's Allowed

Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and the holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

1. **Class 1 – Priority Non-Tax Claims**

a. *Classification*: Class 1 consists of all Allowed Priority Non-Tax Claims.

b. *Treatment*: Except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment, on the Effective Date (or as soon as reasonably practicable thereafter), in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Non-Tax Claim, each Holder of an Allowed Priority Non-Tax Claim will, at the option of the Debtors or the Reorganized Debtors (i) receive payment in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

c. *Voting*: Class 1 is Unimpaired under the Plan. Holders of Allowed Priority Non-Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

2. **Class 2 – Other Secured Claims**

a. *Classification*: Class 2 consists of all Allowed Other Secured Claims.

b. *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, on the Effective Date (or as soon as reasonably practicable thereafter), in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Other Secured Claim, at the option of the Debtors or the Reorganized Debtors, each such Holder will receive (i) payment in full in Cash of its Allowed Other Secured Claim, (ii) the collateral securing its Allowed Other Secured Claim, (iii) Reinstatement of such Holder's Allowed Other Secured Claim, or (iii) such other treatment that will render such Holder's Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.

c. *Voting*: Class 2 is Unimpaired under the Plan. Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

3. **Class 3 – ABL Facility Claims**

a. *Classification*: Class 3 consists of all Allowed ABL Facility Claims.

b. *Allowance*: The ABL Facility Claims shall be Allowed (i) for the ABL Revolving Loan Claims, in the aggregate principal amount of approximately $153.2 million, plus any and all accrued and unpaid interest, fees, premiums, and all other obligations, amounts, and expenses due and owing under the ABL Facility Documents on account of the ABL Revolving Loan Claims as of the Effective Date (including amounts accrued through the Effective Date); and (ii) for the ABL

Letters of Credit Claims, in the aggregate principal amount of approximately $4.1 million plus any and all accrued and unpaid interest, fees, premiums, and all other obligations, amounts, and expenses due and owing under the ABL Facility Documents on account of the ABL Letters of Credit Claims as of the Effective Date (including amounts accrued through the Effective Date); *provided* that the final amount of ABL Revolving Loan Claims or ABL Letters of Credit Claims shall be adjusted upwards or downwards, if applicable and as appropriate, to reflect the issuance of any new ABL Letters of Credit and any related postpetition paydown of the principal amount of the ABL Facility, in each case, pursuant to the DIP Orders.

c.      *Treatment*: Except to the extent such Holder agrees to less favorable treatment (with the consent of the Required Consenting Second-Out Creditors), on the Effective Date (or as soon as reasonably practicable thereafter), each Holder of an Allowed ABL Facility Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed ABL Facility Claim, payment in full in Cash, *provided that*, undrawn ABL Letters of Credit will be, at the option of the Debtors or Reorganized Debtors (with the consent of the Required Consenting Second-Out Creditors), (i) cash collateralized, (ii) supported by "back-to-back" letters of credit under the Exit ABL Facility or other facility, or (iii) otherwise treated in a manner acceptable to the issuer.

d.      *Voting*: Class 3 is Unimpaired under the Plan. Holders of Allowed ABL Facility Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

4.      **Class 4 – First-Out Revolving Loans Claims**

a.      Classification: Class 4 consists of all First-Out Revolving Loans Claims.

b.      *Allowance*: The First-Out Revolving Loans Claims shall be Allowed in the aggregate principal amount of approximately $100 million, plus any and all accrued and unpaid interest, fees, premiums, and all other obligations, amounts, and expenses due and owing under the First-Out/Second-Out Documents on account of the First-Out Revolving Loans Claims as of the Effective Date (including amounts accrued through the Effective Date).

c.      *Treatment*: Except to the extent such Holder agrees to less favorable treatment (with the consent of the Required Consenting Second-Out Creditors), on the Effective Date (or as soon as reasonably practicable thereafter), each Holder of an Allowed First-Out Revolving Loans Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed First-Out Revolving Loans Claim payment in full in Cash. This treatment reflects the effectuation of the turnover provisions of the applicable Intercreditor Agreements.

d.      *Voting*: Class 4 is Unimpaired under the Plan. Holders of Allowed First-Out Revolving Loans Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

5.    **Class 5 – First-Out Term Loans/Notes Claims**

a.    *Classification*: Class 5 consists of all Allowed First-Out Term Loans/Notes Claims.

b.    *Allowance*: The First-Out Term Loans/Notes Claims shall be Allowed (i) for the First-Out Term Loans Claims, in the aggregate principal amount of approximately $436.2 million, plus any and all accrued and unpaid interest, fees, premiums, and all other obligations, amounts, and expenses due and owing under the First-Out/Second-Out Documents on account of the First-Out Term Loans Claims as of the Effective Date (including amounts accrued through the Effective Date) and (ii) for the First-Out Notes Claims, in the aggregate face amount of approximately $10.4 million, plus any and all accrued and unpaid interest, fees, premiums, and all other obligations, amounts, and expenses due and owing in accordance with the First-Out Notes Documents on account of the First-Out Notes Claims as of the Effective Date (including amounts accrued through the Effective Date).

c.    *Treatment*: Except to the extent such Holder agrees to less favorable treatment (with the consent of the Required Consenting Second-Out Creditors), on the Effective Date (or as soon as reasonably practicable thereafter), each Holder of an Allowed First-Out Term Loans/Notes Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed First-Out Term Loans/Notes Claim, payment in full in Cash. This treatment reflects the effectuation of the turnover provisions of the applicable Intercreditor Agreements.

d.    *Voting*: Class 5 is Unimpaired under the Plan. Holders of Allowed First-Out Term Loans/Notes Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

6.    **Class 6 – First Lien Secured Claims**

a.    *Classification*: Class 6 consists of all Allowed First Lien Secured Claims.

b.    *Allowance*: The Second-Out Claims shall be Allowed, in the aggregate principal amount of $1,773,313,683.74 plus any and all accrued and unpaid interest, fees, premiums, and all other obligations, amounts, and expenses due and owing under the First-Out/Second-Out Documents on account of the Second-Out Loans as of the Effective Date (including amounts accrued through the Effective Date). The amount of the Allowed Secured Claim in respect of the Second-Out Claims shall be $381,077,153. The Amended Term Loan Claims shall be Allowed, in the aggregate principal amount of $46,225,666.12 plus any and all accrued and unpaid interest, fees, premiums, and all other obligations, amounts, and expenses due and owing under the Amended Term Loan Credit Facility Documents as of the Effective Date (including amounts accrued through the Effective Date). The amount of the Allowed Secured Claim in respect of the Amended Term Loan Claims shall be $17,260,816.

c.    *Treatment*: Except to the extent that a Holder of an Allowed Second-Out Claim or an Allowed Amended Term Loan Claim, as applicable, agrees to less favorable treatment (with the consent of the Required Consenting Second-Out Creditors), on the Effective Date (or as soon as reasonably practicable thereafter), each Holder of an Allowed Second-Out Claim or Allowed Amended Term Loan Claim, as applicable, on account of its Allowed First Lien Secured Claim

shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed First Lien Secured Claim, prior to giving effect to the turnover provisions in the applicable Intercreditor Agreements, its pro rata share (as a proportion of all First Lien Funded Debt Claims) of (i) the First Lien Secured Claims Recovery, (ii) the Distributable New Common Shares and (iii) the Subscription Rights. Notwithstanding the immediately preceding sentence, after giving effect to the turnover provisions in the applicable Intercreditor Agreements, on the Effective Date, (x) Holders of Second-Out Claims on account of their respective Second-Out Claims that are Secured shall receive in the aggregate (i) no Cash, (ii) 98.220% of the Distributable New Common Shares and (iii) 98.220% of the Subscription Rights and (y) Holders of Amended Term Loan Claims on account of their respective Amended Term Loan Claims that are Secured shall receive in the aggregate (i) cash in the amount of \$10,516,581, (ii) 1.780% of the Distributable New Common Shares, and (iii) 1.780% of the Subscription Rights.

d. *Voting*: Class 6 is Impaired under the Plan. Therefore, Holders of Allowed First Lien Secured Claims are entitled to vote to accept or reject the Plan.

7. **Class 7 – Unsecured Funded Debt Claims**

a. *Classification*: Class 7 consists of all Allowed Unsecured Funded Debt Claims.

b. *Treatment*: Except to the extent such Holder agrees to less favorable treatment (with the consent of the Required Consenting Second-Out Creditors), on the Effective Date (or as soon as reasonably practicable thereafter), each Holder of an Allowed Unsecured Funded Debt Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed Unsecured Funded Debt Claim, its Pro Rata share of the Unsecured Funded Debt Claim Recovery.

c. *Voting*: Class 7 is Impaired under the Plan. Therefore, Holders of Allowed Unsecured Funded Debt Claims are entitled to vote to accept or reject the Plan.

8. **Class 8 – General Unsecured Claims**

a. *Classification*: Class 8 consists of all Allowed General Unsecured Claims.

b. *Treatment*: Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on the Effective Date (or as soon as reasonably practical thereafter), in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim will, at the option of the Debtors or the Reorganized Debtors (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

c. *Voting*: Class 8 is Unimpaired under the Plan. Holders of Allowed General Unsecured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

9.     **Class 9 – Intercompany Claims**

a.     *Classification*: Class 9 consists of all Allowed Intercompany Claims.

b.     *Treatment*: On the Effective Date (or as soon as reasonably practicable thereafter), all Allowed Intercompany Claims will be: (i) Reinstated, (ii) adjusted, (iii) converted to equity, set off, settled, distributed or contributed, or (iv) discharged, cancelled, and released, as reasonably determined to be appropriate by the Reorganized Debtors.

c.     *Voting*: Claims in Class 9 are either (i) Unimpaired, in which case the Holders of such Claims are conclusively presumed to have accepted the Plan and are, therefore, not entitled to vote on the Plan or (ii) Impaired and not receiving or retaining any property under the Plan, in which case the Holders of such Claims are deemed to have rejected the Plan, and are, therefore, not entitled to vote on the Plan.

10.     **Class 10 – Intercompany Interests**

a.     *Classification*: Class 10 consists of all Intercompany Interests other than the Existing Equity Interests.

b.     *Treatment*: On the Effective Date (or as soon as reasonably practicable thereafter), all Intercompany Interests will be adjusted, Reinstated, or cancelled, as reasonably determined to be appropriate by the Reorganized Debtors.

c.     *Voting*: Interests in Class 10 are either (i) Unimpaired, in which case the Holders of such Interests are conclusively presumed to have accepted the Plan and are, therefore, not entitled to vote on the Plan or (ii) Impaired and not receiving or retaining any property under the Plan, in which case the Holders of such Interests are deemed to have rejected the Plan, and are, therefore, not entitled to vote on the Plan.

11.     **Class 11 – Existing Equity Interests**

a.     *Classification*: Class 11 consists of all Existing Equity Interests.

b.     *Treatment*: If Reorganized Parent is a direct or indirect non-Debtor parent of USS Parent or another Entity that upon the consummation of the Restructuring Transactions will directly or indirectly own all of the assets of USS Parent, then the Holders of Existing Equity Interests shall receive no recovery or distribution on account of such Existing Equity Interests and the Existing Equity Interests shall be Reinstated solely for the purposes of maintaining the corporate ownership of USS Parent as contemplated by the Plan and the Restructuring Transactions. If Reorganized Parent is USS Parent, then all Existing Equity Interests shall be discharged, cancelled, released, and extinguished upon the Effective Date and will be of no further force or effect, and Holders of Existing Equity Interests will not receive any distributions on account of such Existing Equity Interests.

c.     *Voting*: Class 11 is Impaired and not receiving or retaining any property under the Plan. Holders of Allowed Existing Equity Interests are deemed to have rejected the Plan pursuant

to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

12.    **Class 12 – Subordinated Claims Class**

a.    *Classification*: Class 12 consists of all Subordinated Claims.

b.    *Treatment*: All Subordinated Claims, if any, shall be discharged, cancelled, released, and extinguished on the Effective Date and shall be of no further force or effect, and Holders of Subordinated Claims will not receive any distributions on account of such Subordinated Claims.

c.    *Voting*: Class 12 is Impaired under the Plan. Holders of Allowed Subordinated Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing herein shall impair, prevent or otherwise adversely affect, the Debtors' or Reorganized Debtors' rights and defenses in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, setoffs or recoupment rights against, any such Unimpaired Claims.

D.    *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Court as of the date of the hearing on confirmation of the Plan shall be deemed eliminated from this Plan for purposes, including, without limitation, voting to accept or reject the Plan and determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.    *Voting Classes, Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests is eligible to vote and no Holders of Claims or Interests eligible to vote in such Class votes to accept or reject this Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted this Plan.

F.    *Existing Equity Interests and Intercompany Interests*

To the extent Reinstated under this Plan, (i) distributions on account of the Existing Equity Interests and/or the Intercompany Interests are not being received by Holders of such Existing Equity Interests and/or Intercompany Interests on account of such Interests but solely for the purposes of administrative convenience and due to the importance of maintaining the prepetition corporate structure, including the consolidated tax group, for the ultimate benefit of the holders of New Common Shares, and in exchange for the Debtors' agreement under this Plan to make certain distributions to the Holders of Allowed Claims, and (ii) other than as may be described in the Restructuring Transactions Memorandum, all Intercompany Interests shall be owned on and after

the Effective Date by the Reorganized Debtor that is the successor in interest to the Debtor that owned such Intercompany Interests immediately prior to the Effective Date.

G.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of this Plan by one or more of the Classes entitled to vote pursuant to Article III.B of this Plan. The Debtors shall seek Confirmation of this Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify this Plan in accordance with Article X hereof and the terms of the Restructuring Support Agreement (including the consent rights provided therein) to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

H.    *Subordinated Claims and Interests*

The allowance, classification, and treatment of all Allowed Claims and Interests and their respective distributions and treatments under this Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors or the Reorganized Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination rights relating thereto.

## ARTICLE IV
## MEANS FOR IMPLEMENTATION OF PLAN

A.    *General Settlement of Claims and Interests*

Pursuant to section 1123 of the Bankruptcy Code, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute an arms' length and good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies resolved pursuant to the Plan. All distributions made to Holders of Allowed Claims and Allowed Interests in any Class in accordance with the Plan are intended to be, and shall be, final and indefeasible and reflect the settlement and compromises set forth herein, including that the distributions and recoveries set forth in Article III hereof shall be limited to the treatment and recoveries described therein and in no way shall give effect to any Claims or rights to distribution or recoveries that may be asserted under the Intercompany Credit Agreement Documents by Vortex Opco, LLC.

B.    *Restructuring Transactions*

Prior to, on, or after the Effective Date, subject to and consistent with the terms of their obligations under the Plan, the Restructuring Support Agreement and the ERO Backstop

Agreement (pursuant to the ERO Backstop Order) (in each case, including any consent rights set forth therein), the Debtors and Reorganized Debtors, as applicable, shall be authorized to enter into such transactions and take such other actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan, and as set forth in and consistent with the Restructuring Transactions Memorandum, including: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, or reorganization containing terms that are consistent with the terms of the Plan, the Restructuring Support Agreement, and other applicable Definitive Documents, and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan, the Restructuring Support Agreement, and other applicable Definitive Documents; (3) the filing of appropriate certificates of incorporation, merger, migration, conversion, consolidation, or other organizational documents with the appropriate governmental authorities pursuant to applicable law; (4) the implementation of the Equity Rights Offering pursuant to the terms and conditions set forth in the ERO Backstop Agreement (pursuant to the ERO Backstop Order), ERO Procedures and any other ERO Documents; (5) the execution and delivery of the New Organizational Documents and the issuance, distribution, reservation, or dilution, as applicable, of the New Common Shares; (6) the execution and delivery of the Exit Term Loan Facility Documents, Exit RCF Facility Documents, ERO Documents, and Exit ABL Facility Documents; (7) implementation of the Management Incentive Plan; and (8) all other actions that the Reorganized Debtors determine are necessary or appropriate; provided that such other actions are consistent with the terms of the Plan, the Restructuring Support Agreement, and the other applicable Definitive Documents.

The Confirmation Order shall and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions that may be necessary or appropriate to effect any Restructuring Transaction, including, without limitation, the items described above.

     C.     *Sources of Consideration for Restructuring Transactions*

     1.     Cash

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under the Plan required to be paid in Cash from Cash on hand, including Cash from operations, the proceeds of the DIP Facility, the Equity Rights Offering, the Exit ABL Facility, Exit RCF Facility, and the Exit Term Loan Facility.

The Reorganized Debtors shall use the proceeds of the Exit Term Loan Facility, the Exit RCF Facility, the Exit ABL Facility, and the Equity Rights Offering to: (a) pay distributions on account of Allowed DIP Claims in accordance with Article II.C; (b) pay all outstanding Restructuring Expenses as required by the Plan; (c) fund the Professional Fee Escrow Account; and (d) pay Allowed Claims to the extent provided for in Article II and Article III of the Plan. The Reorganized Debtors may use any remaining proceeds from the Exit Term Loan Facility, the Exit RCF Facility, the Exit ABL Facility, and the Equity Rights Offering (a) to make any other payments authorized under the Plan and (b) for working capital and general corporate purposes after the Effective Date.

2.     Exit Term Loan Facility, Exit RCF Facility, and Exit ABL Facility

On the Effective Date, the Reorganized Debtors shall borrow funds under (a) the Exit Term Loan Facility as provided in the Exit Term Loan Facility Documents, (b) the Exit RCF Facility as provided in the Exit RCF Facility Documents, and (c) the Exit ABL Facility as provided in the Exit ABL Facility Documents.

The Confirmation Order shall constitute approval of (a) the Exit Term Loan Facility and the Exit Term Loan Facility Documents, (b) the Exit RCF Facility and the Exit RCF Facility Documents and (c) the Exit ABL Facility and the Exit ABL Facility Documents (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or Reorganized Debtors in connection therewith) to the extent not approved by the Court earlier, and the Reorganized Debtors shall be authorized to execute and deliver all documents, including the Exit Term Loan Facility Documents, the Exit RCF Facility Documents, and the Exit ABL Facility Documents, necessary or appropriate to incur loans under the Exit Term Loan Facility, the Exit RCF Facility and the Exit ABL Facility without further notice to or order of the Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval, subject to (a) such modifications as the Reorganized Debtors and the Exit Term Loan Parties may mutually agree to be necessary to consummate the Exit Term Loan Facility, (b) such modifications as the Reorganized Debtors and the Exit RCF Facility Parties may mutually agree to be necessary to consummate the Exit RCF Facility and (c) such modifications as the Reorganized Debtors and the Exit ABL Facility Parties may mutually agree to be necessary to consummate the Exit ABL Facility.

Each of the Exit Term Loan Facility Documents, the Exit RCF Facility Documents, and the Exit ABL Facility Documents shall constitute legal, valid, binding and authorized joint and several obligations of the applicable Reorganized Debtors, enforceable in accordance with their respective terms, and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination (whether equitable, contractual or otherwise) for any purposes whatsoever under applicable law, the Plan or the Confirmation Order, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law. The financial accommodations to be extended pursuant to the Exit Term Loan Facility Documents, the Exit RCF Facility Documents, and the Exit ABL Facility Documents are reasonable and are being extended, and shall be deemed to have been extended, in good faith and for legitimate business purposes.

On the Effective Date, all Liens and security interests granted pursuant to, or in connection with the Exit Term Loan Facility Documents, the Exit RCF Facility Documents, or the Exit ABL Facility Documents, as applicable, shall (i) be deemed approved, (ii) be valid, binding, perfected, non-avoidable and enforceable Liens on and security interests in the property described in the Exit Term Loan Facility Documents, the Exit RCF Facility Documents, or the Exit ABL Facility Documents, as applicable, with the priorities established in respect thereof under applicable non-bankruptcy law and any applicable intercreditor agreements, without the need for the taking of any further filing, recordation, approval, consent or other action, and be subject only to such Liens as may be permitted under the Exit Term Loan Facility Documents, the Exit RCF Facility Documents, or the Exit ABL Facility Documents, as applicable, and (iii) not be enjoined or subject

to discharge, impairment, release, avoidance, recharacterization, or subordination (whether equitable, contractual or otherwise) for any purpose whatsoever under any applicable law, the Plan, or the Confirmation Order and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law.

The Reorganized Debtors and the persons granted Liens and security interests under the Exit Term Loan Facility, the Exit RCF Facility or the Exit ABL Facility are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order without the need for any filings, recordings, or consents) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

3.      Equity Rights Offering and ERO Backstop Agreement

Pursuant to the ERO Procedures, on the Effective Date, the Reorganized Parent will sell Rights Offering Shares to participating holders of Subscription Rights, including the ERO Backstop Parties. In the Equity Rights Offering, Holders of Allowed Second-Out Claims and/or Allowed Amended Term Loan Claims will be able to purchase a pro rata percentage of the Rights Offering Shares. The number of shares to be issued or delivered as New Common Shares, including ERO Equity, will be determined shortly before the Effective Date.

The ERO Equity, including the Direct Investment Shares, will be issued or delivered at the ERO Per Share Subscription Price.

The Rights Offering Shares offered in the Equity Rights Offering will be backstopped, severally and not jointly, by the ERO Backstop Parties pursuant to the ERO Backstop Agreement. As set forth in the Restructuring Support Agreement and subject to the conditions provided therein, including the execution of a joinder agreement to the ERO Backstop Agreement and the Restructuring Support Agreement by the relevant party, at any time from the date of commencement of solicitation of votes on the Plan through and including five (5) business days thereafter, the Debtors may offer to each holder of Amended Term Loan Claims and Second-Out Claims, the opportunity to participate as a "Commitment Party" (as that term is used in the ERO Backstop Agreement) on the same terms and conditions as the existing Commitment Parties thereunder. The Reorganized Debtors will pay the ERO Backstop Premium in the form of the ERO Backstop Premium Shares to the ERO Backstop Parties on the Effective Date in accordance with the terms and conditions set forth in the ERO Backstop Agreement and the ERO Backstop Order or, in the circumstances provided in the ERO Backstop Agreement, pay the ERO Backstop Cash Premium to the ERO Backstop Parties upon termination of the ERO Backstop Agreement.

Pursuant to the ERO Documents, the Direct Investment Shares shall be purchased by and distributed to the ERO Backstop Parties. The Rights Offering Shares shall be purchased by and distributed to participating holders of Subscription Rights, including the ERO Backstop Parties, on the terms set forth in ERO Documents.

The Subscription Rights that a Holder of an Allowed Second-Out Claim or Allowed Amended Term Loan Claim has validly elected to exercise shall be deemed issued and exercised on or about (but in no event after) the Effective Date. Once the Subscription Rights have been exercised pursuant to the terms of the ERO Backstop Agreement and the ERO Procedures, the Reorganized Debtors shall be authorized to issue or deliver the number of shares of Rights Offering Shares necessary to satisfy such exercise. Pursuant to the ERO Backstop Agreement and ERO Backstop Order, the ERO Backstop Parties shall purchase, severally and not jointly, their applicable portion of any Unsubscribed Equity in accordance with the terms and conditions set forth in the ERO Backstop Agreement and the ERO Procedures.

Entry of the ERO Backstop Order and the Confirmation Order shall constitute Court approval of the Equity Rights Offering (including the transactions contemplated thereby, and all actions to be undertaken, undertakings to be made, and obligations to be incurred by the Debtors and Reorganized Debtors in connection therewith). On the Effective Date, the rights and obligations of the Debtors under the ERO Backstop Agreement shall vest in the Reorganized Debtors.

Each holder of Subscription Rights that receives Rights Offering Shares as a result of exercising its Subscription Rights shall be subject to the provisions applicable to the holders of New Common Shares as set forth in this Article IV.C.

4.      New Common Shares

The Debtors are part of a consolidated federal income tax group of which a non-Debtor Entity, PECF USS Holding Corporation, is the ultimate parent. However, PECF USS Holding Corporation and its direct subsidiary that holds or controls the Existing Equity Interests are neither controlled by the Debtors nor constitute obligors under the Debtors' existing debt. A deconsolidation of the Debtors' federal income tax group could lead to significant cash tax liability for the Reorganized Debtors. Therefore, the Ad Hoc Group has reached an agreement with PECF USS Holding Corporation that prevents a tax deconsolidation of the Debtors and Reorganized Debtors. The Restructuring Transactions Memorandum will set forth the steps that will be taken in order to effectuate the transfer of the shares of PECF USS Holding Corporation in exchange for the PECF USS Holding Corporation's Equity Owner Consideration as provided for under the Restructuring Support Agreement and the ERO Backstop Agreement. Notwithstanding anything herein to the contrary, if the Required Consenting Second-Out Creditors, the Debtors and the relevant Entity consent, then Reorganized Parent may be such other Entity as agreed to by such parties, in a manner otherwise consistent with the foregoing.

The Reorganized Debtors shall be authorized to issue or deliver New Common Shares pursuant to the New Organizational Documents. The issuance of the New Common Shares shall be authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors, as applicable. On the Effective Date, the New Common Shares shall be issued or delivered and distributed pursuant to, and in accordance with, the Plan and any Plan Supplement document, including the Restructuring Transactions Memorandum.

All of the New Common Shares issued or delivered pursuant to this Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VI hereof shall be governed by the terms and conditions set forth in this Plan

applicable to such distribution or issuance, including the New Organizational Documents, which terms and conditions shall bind each Entity receiving such distribution or issuance. Any Entity's acceptance of the New Common Shares shall be deemed to constitute its agreement to the New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms.

D.     *Corporate Existence*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated herein, including the Restructuring Transactions Memorandum, each Reorganized Debtor and its direct and indirect subsidiaries shall continue to exist after the Effective Date as a separate corporation, limited liability company, limited partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, limited partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which the applicable Debtor is incorporated or formed and pursuant to its bylaws, limited liability company agreement, operating agreement, limited partnership agreement (or other formation documents) in effect prior to the Effective Date, except to the extent such formation documents are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval of the Court, or any other Entity (other than any requisite filings required under applicable law).

E.     *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated herein, including the Restructuring Transactions Memorandum, on the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of each Estate, all Causes of Action (including, without limitation, all Causes of Action identified in the Schedule of Retained Causes of Action), and any property acquired by the Debtors pursuant to the Plan shall vest in the Reorganized Debtors, free and clear of all Liens, Claims, charges, interests, or other encumbrances other than the Liens securing the obligations under the Exit Term Loan Facility, the Exit RCF Facility, the Exit ABL Facility and such other Liens or other encumbrances as may be permitted thereby. On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Court, or any other Entity and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, including for the avoidance of doubt any restrictions on the use, acquisition, sale, lease, or disposal of property under section 363 of the Bankruptcy Code.

The Plan shall be conclusively deemed to be adequate notice that Liens, Claims, charges, interest, and other encumbrances are being extinguished.

F.     *Cancellation of Loans, Securities, and Agreements*

On the Effective Date (except as otherwise provided in the Plan, the Confirmation Order, the Restructuring Support Agreement, the ERO Documents, the Exit Term Loan Facility Documents, the Exit RCF Facility Documents, the Exit ABL Facility Documents, and any agreement, instrument or other document entered into in connection with or pursuant to the Plan),

(1) all credit agreements, security agreements, indentures, equity securities, shares, equity awards, purchase rights, options, warrants, intercreditor agreements, notes, instruments, certificates, and other documents evidencing indebtedness or ownership of the Debtors giving rise to Claims or Interests (except, in each case, those that give rise to Claims or Interests that are Reinstated under the Plan) shall be cancelled and the obligations of the Debtors or the Reorganized Debtors thereunder or in any way related thereto shall be discharged and deemed satisfied in full, and the Agents/Trustees and the DIP Agent shall be released from all duties thereunder without any need for further action or approval of the Court, or any holder thereof or any other person or Entity and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation, or similar documents governing the shares, certificates, notes, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of, or ownership interest in, the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically Reinstated pursuant to the Plan) shall be deemed satisfied in full, cancelled, released, and discharged without any need for further action or approval of the Court, or any holder thereof or any other person or Entity.

Notwithstanding Confirmation or the occurrence of the Effective Date, any document described in the immediately preceding paragraph that governs the rights of the Holders of Claims or Interests shall continue in effect solely for purposes of (a) enabling Holders of Allowed Claims and Allowed Interests to receive distributions under the Plan as provided herein, and to take other actions required or permitted under the Plan on account of Allowed Claims; (b) governing the contractual rights and obligations among the Agents/Trustees or DIP Agent and the lenders or holders party thereto (including, without limitation, indemnification, contribution, expense reimbursement, and distribution provisions); (c) permitting the Agents/Trustees and the DIP Agent to perform any functions that are necessary to effectuate the immediately foregoing, including appearing and being heard in the Chapter 11 Cases or in any other court or proceeding in the Court relating to the First-Out/Second-Out Credit Agreement or the ABL Credit Agreement, as applicable, and in furtherance of the foregoing; (d) permitting the Agents/Trustees and the DIP Agent to enforce any obligations owed to them under the Plan; (e) permitting the Agents/Trustees and the DIP Agent to take any action and execute any documents necessary to terminate, cancel, extinguish, and/or evidence the release of any and all Liens and other security interests with respect to the ABL Facility Claims, First-Out Claims, the Second-Out Claims, the Second-Out Deficiency Claims, the Third-Out Claims, the Amended Term Loan Claims, the Amended Term Loan Deficiency Claims, the Intercompany Credit Agreement Claims, or the DIP Claims, including, without limitation, the preparation and filing, in form, substance, and content reasonably acceptable to the applicable Agents/Trustees or DIP Agent, of any and all documents necessary to terminate, satisfy, or release any Liens and other security interests held by the applicable Agents/Trustees or DIP Agent, including UCC-3 termination statements; (f) permitting the Agents/Trustees and the DIP Agent to appear in the Chapter 11 Cases or in any proceeding of the Court or any other court in furtherance of the foregoing; and (g) furthering any other purpose set forth in the Restructuring Support Agreement or the Plan, including the issuance of New Common Shares.

Upon the payment in full or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the Holder of such Allowed Other Secured Claim shall deliver to the Reorganized Debtors any collateral or other property of a Debtor held by such Holder, together

with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its satisfied Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or *lis pendens*, or similar interests or documents.

### G. *Corporate and Other Entity Action*

On the Effective Date, all actions contemplated by the Plan (including, for the avoidance of doubt, the Plan Supplement) shall be deemed authorized and approved in all respects, including, as applicable: (1) appointment of the New Boards pursuant to Article IV.I and any other managers, directors, or officers for the Reorganized Debtors identified in the Plan Supplement; (2) the issuance or delivery and distribution of the New Common Shares, including on account of the Equity Rights Offering and the Management Incentive Plan (to the extent applicable); (3) adoption of the New Organizational Documents; (4) entry into the Exit Term Loan Facility Documents, the Exit RCF Facility Documents, the Exit ABL Facility Documents, and the ERO Documents; (5) implementation of the Restructuring Transactions; (6) the assumption, assumption and assignment, or rejection, as applicable, of Executory Contracts and Unexpired Leases; and (7) all other actions contemplated under or required to consummate the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate or other Entity structure, and any corporate or other Entity action required by the Debtors or Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action or approval by the security holders, managers, or officers of the Debtors or the Reorganized Debtors. Prior to, on, or after the Effective Date (as appropriate), all actions required by this Plan that would otherwise require approval of the security holders, directors, officers, managers, members, or partners of the Debtors (as of prior to the Effective Date) shall be deemed to have been so approved and shall be in effect prior to, on, or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the security holders, directors, officers, managers, members or partners of the Debtors or the Reorganized Debtors, or the need for any approvals, authorizations, actions, or consents of any Person or Entity. The authorizations and approvals contemplated by this Article IV.G shall be effective notwithstanding any requirements under applicable non-bankruptcy law.

### H. *New Organizational Documents*

On the Effective Date, Reorganized Parent shall adopt the New Organizational Documents, which shall become effective and binding in accordance with their terms and conditions, in each case without further notice to or order of the Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any person or Entity. On or prior to the Effective Date or as soon thereafter as is practicable, the Reorganized Debtors shall, if so required under applicable state law, file their New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation in accordance with the corporate laws of the respective states, provinces, or countries of incorporation or formation. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents and other constituent documents as permitted by the laws of their respective states, provinces, or

countries of incorporation or formation, and their respective New Organizational Documents, without further order of the Court.

Each holder of New Common Shares shall be deemed to have executed, be a party to and be bound by the terms of the New Organizational Documents from and after the Effective Date, even if not an actual signatory thereto and without the need to deliver signature pages thereto.

I.    *Directors and Officers of Reorganized Debtors*

As of the Effective Date, unless otherwise stated herein, in the Plan Supplement, or the applicable New Organizational Documents, the terms of the current members of the boards of directors or managers (as applicable) of the Debtors shall expire, such directors or managers (as applicable) shall be deemed to have resigned, and the initial members of the New Boards and the officers of each Reorganized Debtor shall be appointed in accordance with the respective New Organizational Documents. The members of the New Boards will be identified in the Plan Supplement to the extent known. Each such director, manager, and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of the Reorganized Debtors and may be replaced or removed in accordance with such documents.

Except to the extent that a member of a Debtor's board of directors or managers, as applicable, continues to serve as a director or manager of the applicable Reorganized Debtor, the members of the board of directors or managers, as applicable, of each Debtor prior to the Effective Date shall have no continuing obligations to the Reorganized Debtors in their capacities as such on or after the Effective Date and each such director or manager shall be deemed to have resigned or shall otherwise cease to be a director or manager on the Effective Date.

1.    Reorganized Parent Board

The initial Reorganized Parent Board shall be appointed on the Effective Date in accordance with the Restructuring Support Agreement and the New Organizational Documents. The members of the initial Reorganized Parent Board shall be disclosed in the Plan Supplement to the extent known.

2.    Officers of Reorganized Debtors

Except as otherwise provided in the Plan Supplement, the officers of the Debtors immediately before the Effective Date shall serve as the initial officers of the respective Reorganized Debtors on and after the Effective Date. After the Effective Date, the selection of officers of the Reorganized Debtors shall be as provided by their respective organizational documents.

3.    New Subsidiary Boards

On the Effective Date, the New Subsidiary Boards shall be appointed in accordance with the applicable New Organizational Documents or as set forth in the Plan Supplement.

J.     *Exemption from Securities Laws*

Prior to the Petition Date, the Debtors relied on section 4(a)(2) of the Securities Act, and similar state securities law provisions ("***Blue Sky Laws***") or Regulation S under the Securities Act, to exempt from registration under the Securities Act and Blue Sky Laws the offering of (i) the Distributable New Common Shares and (ii) the Subscription Rights, in each case (i) and (ii) on account of Claims described in this Plan, including in connection with the solicitation of votes to accept or reject the Plan. After the Petition Date, the Debtors will rely on (a) section 1145(a) of the Bankruptcy Code to exempt from registration under the Securities Act and Blue Sky Laws the offer, issuance or delivery, and distribution, if applicable, of Distributable New Common Shares on account of Claims and the ERO Backstop Premium Shares, and to the extent such exemption is not available, then the offer and issuance or delivery of such Distributable New Common Shares on account of Claims and the ERO Backstop Premium Shares will be offered, issued or delivered, and distributed under the Plan pursuant to other applicable exemptions from registration under the Securities Act and any other applicable securities laws, and (b) Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, or Regulation S under the Securities Act, and similar Blue Sky Laws provisions, to exempt from registration under the Securities Act and Blue Sky Laws the offer and issuance or delivery, if applicable, of the Subscription Rights, and the ERO Equity.

1.     Section 4(a)(2) of the Securities Act, Regulation D and Regulation S

Any securities issued or delivery pursuant to Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, or Regulation S under the Securities Act will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned, or otherwise transferred only pursuant to registration or an applicable exemption from registration under the Securities Act and other applicable law. In that regard, each Holder of an Allowed Second-Out Claim or Allowed Amended Term Loan Claim participating in the Equity Rights Offering will be required to make, and each of the ERO Backstop Parties has made, customary representations to the Debtors, including that each is an "accredited investor" (within the meaning of Rule 501(a) of the Securities Act), a qualified institutional buyer (as defined under Rule 144A promulgated under the Securities Act) or is not a U.S. person (as defined in Regulation S under the Securities Act). Section 4(a)(2) of the Securities Act provides that the issuance or delivery of securities by an issuer in transactions not involving a public offering are exempt from registration under the Securities Act. Regulation D is a non-exclusive safe harbor from registration promulgated by the SEC under the Securities Act. Regulation S provides that the offering or issuance or delivery of securities to persons that, at the time of the issuance or delivery, were outside of the United States and were not "U.S. persons" (and were not purchasing for the account or benefit of a "U.S. person") within the meaning of Regulation S is exempt from registration under Section 5 of the Securities Act. Any Persons receiving restricted securities under this Plan should consult with their own counsel concerning the availability of an exemption from registration for resale of these securities under the Securities Act and other applicable law.

2.     Section 1145 Exemption

Pursuant to section 1145 of the Bankruptcy Code, the offer, issuance, and distribution under this Plan of any securities on account of a Claim and the ERO Backstop Premium Shares

shall (a) be exempt, without further act or actions by any Entity, from registration under the Securities Act and any other applicable U.S. state or local law requiring registration for the offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security to the fullest extent permitted by section 1145 of the Bankruptcy Code, (b) (i) not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (ii) be freely tradable and transferable by any initial recipient thereof that (w) is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act, (x) has not been such an "affiliate" within ninety (90) calendar days of such transfer, (y) has not acquired the New Common Shares or Subscription Rights from an "affiliate" of the Reorganized Debtors within one year of such transfer, and (z) is not an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code, and (c) be freely tradable by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, (ii) compliance with applicable securities laws and any rules and regulations of the SEC, if any, applicable at the time of any future transfer of such securities or instruments, and (iii) the restrictions in the New Organizational Documents.

Any transfer agent, or other similarly situated agent, trustee, or other non-governmental Entity shall accept and rely upon the Plan and Confirmation Order in lieu of a legal opinion for purposes of determining whether the initial offer or the delivery and sale of the New Common Shares were exempt from registration under section 1145(a) of the Bankruptcy Code, and whether the New Common Shares were, under the Plan, validly issued, fully paid, and non-assessable.

The Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order to any Entity (including DTC or any transfer agent for the New Common Shares) with respect to the treatment of the New Common Shares to be issued or delivered under the Plan under applicable securities laws. DTC or any transfer agent for the New Common Shares shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Common Shares to be issued or delivered under the Plan are exempt from registration or eligible for DTC book-entry delivery, settlement, and depository services, and whether the New Common Shares are, under the Plan, validly issued, fully paid, and non-assessable. Notwithstanding anything to the contrary in this Plan, no Entity (including DTC or any transfer agent for the New Common Shares) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Shares to be issued or delivered under the Plan are exempt from registration, and whether the New Common Shares were, under the Plan, validly issued, fully paid, and non-assessable.

K.    *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtors and the officers and members of the New Boards are authorized to, and may issue, execute, deliver, file, or record, such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, and the securities issued or delivered pursuant to the Plan in the name, and on behalf, of the Reorganized Debtors, without the need for any approvals, authorization, or consents, except for those expressly required pursuant to the Plan or the New Organizational Documents.

L.    *Section 1146 Exemption*

Pursuant to and to the fullest extent provided in section 1146(a) of the Bankruptcy Code, (1) the issuance, transfer, or exchange of any securities, instruments, or documents, (2) the creation of any lien, mortgage, deed of trust, or other security interest, (3) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including, without limitation, any deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan or the reinvesting, transfer, or sale of any real or personal property of the Debtors pursuant to, in implementation of, or as contemplated in the Plan (whether to one or more of the Reorganized Debtors or otherwise), (4) the grant of collateral under the Exit Term Loan Facility Documents, the Exit RCF Facility Documents, and the Exit ABL Facility Documents, and (5) the issuance, renewal, modification, or securing of indebtedness by such means, and the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, FCC filing or recording fee, other regulatory filing or recording fee, sales tax, use tax, or other similar tax or governmental assessment. Consistent with the foregoing, the Confirmation Order will order and direct each recorder of deeds or similar official for any county, city, or Governmental Unit in which any instrument hereunder is to be recorded to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

M.    *Preservation of Causes of Action*

Unless any Causes of Action against any Entity are expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Debtors or Reorganized Debtors, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released or exculpated pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Person or Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any person or Entity.** Unless any Cause of Action against a Person or Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order of the Court, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication,

and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to all Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may have against any Person or Entity shall vest in the applicable Reorganized Debtor. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Court, except to the extent otherwise required by Federal Rule of Civil Procedure 23.1(c) pursuant to Bankruptcy Rule 7023.1. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to this Article IV.M include any claim or Cause of Action with respect to, or against, a Released Party or Exculpated Party.

N.     *Management Incentive Plan*

Within one hundred twenty (120) days following the Effective Date, the Reorganized Parent Board shall adopt the Management Incentive Plan, which will provide for the grants of equity and equity-based awards to employees, directors, consultants, and other service providers of the Reorganized Debtor(s), as determined at the discretion of the Reorganized Parent Board. The terms and conditions, including with respect to participants, allocation, timing, and the form and structure of the equity or equity-based awards, shall be determined at the discretion of the Reorganized Parent Board after the Effective Date. For the avoidance of doubt, New Common Shares issued on account of the Management Incentive Plan will dilute any then-outstanding New Common Shares, including New Common Shares issued or delivered on account of the Equity Rights Offering and the ERO Backstop Agreement.

O.     *DTC Eligibility*

The Debtors and the Reorganized Debtors, as applicable, shall use commercially reasonable efforts to promptly make the New Common Shares, other than any New Common Shares required to bear a "restricted" legend under applicable securities laws (which shall be deposited in DTC to the extent permitted by DTC, otherwise in book entry form) eligible for deposit with DTC.

## ARTICLE V
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.     *Assumption by Default*

Except as otherwise provided in this Plan, each Executory Contract and Unexpired Lease shall, subject to the consent of the Required Consenting Second-Out Creditors (which shall not be unreasonably withheld, delayed, or conditioned), be deemed assumed without the need for any further notice to or action, order, or approval of the Court as of the Effective Date, and the Debtors' rights under each Executory Contract or Unexpired Lease shall vest in the applicable Reorganized Debtors, unless such Executory Contract or Unexpired Lease (a) was previously assumed,

amended and assumed, assumed and assigned, or rejected by the applicable Debtors; (b) previously expired or was terminated pursuant to its own terms; (c) is the subject of a motion to reject such Executory Contract or Unexpired Lease that is pending on the Effective Date or (d) is listed on the Schedule of Rejected Executory Contracts and Unexpired Leases (if any). Any provision in an Executory Contract or Unexpired Lease that restricts, purports to restrict, or is breached or deemed breached by, the Executory Contract's or Unexpired Lease's assumption or assumption and assignment (including a "change of control" provision), shall be deemed modified or stricken such that the applicable counterparty shall not be entitled to terminate its Executory Contract or Unexpired Lease or to exercise any other rights on account of any default. The assumption of Executory Contracts and Unexpired Leases hereunder may include the assumption and assignment of certain of such contracts to Affiliates. The Confirmation Order will constitute an order of the Court approving the above-described assumptions and assignments.

Except as otherwise specifically set forth herein, assumptions of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract and Unexpired Lease assumed pursuant to this Article V.A or by any order of the Court, which has not been assigned to a third party prior to the Effective Date, shall revest in, and be fully enforceable by, the applicable Reorganized Debtors in accordance with its terms (including any amendments that were made after the Petition Date), except as such terms are modified by the provisions of the Plan or any order of the Court authorizing and providing for its assumption. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

Except as otherwise provided herein or agreed to by the Debtors (with the consent of the Required Consenting Second-Out Creditors, which consent shall not be unreasonably withheld, delayed, or conditioned) and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

To the extent any provision of the Bankruptcy Code or the Bankruptcy Rules requires the Debtors to assume or reject an Executory Contract or Unexpired Lease, such requirement shall be satisfied if the Debtors make an election to assume or reject such Executory Contract or Unexpired Lease prior to the deadline set forth by the Bankruptcy Code or the Bankruptcy Rules, as applicable, regardless of whether or not the Court has actually ruled on such proposed assumption or rejection prior to such deadline.

B.    *Assumed Executory Contracts and Unexpired Leases*

The Cure for each assumed Executory Contract or Unexpired Lease shall be Allowed in the amount of $0.00 unless (a) the Plan expressly provides otherwise, (b) a Final Order is entered

Allowing the Cure in a different amount, or (c) the Reorganized Debtors otherwise agree to Allow a Cure in a different amount.

Any dispute regarding the assumption or assumption and assignment of an Executory Contract or Unexpired Lease, including all requests for payment of Cure costs that differ from the amounts paid or proposed to be paid by the Debtors or Reorganized Debtors or any styled as an objection to Confirmation, must be filed with the Court on or before twenty (20) days after the Effective Date (the "***Contract Objection Deadline***"). If, within twenty (20) days of the Contract Objection Deadline, the Debtors reduce a previously proposed Cure or decide to assume (or assume and assign) an Executory Contract or Unexpired Lease that was previously proposed to be rejected, then the counterparty to such affected Executory Contract or Unexpired Lease shall have twenty (20) days after its receipt of notice thereof to file an objection to such Cure reduction or proposed assumption (or assumption and assignment) of such Executory Contract or Unexpired Lease. Any such request that is not timely filed shall be Disallowed and forever barred, estopped and enjoined from assertion, and shall not be enforceable against any Debtor or Reorganized Debtor, without the need for any objection by the Debtors or Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Court. Any Cure costs shall be deemed fully satisfied, released and discharged upon payment by the Debtors or Reorganized Debtors of the applicable Cure costs. Any such objection will be scheduled to be heard by the Court at the hearing on confirmation of the Plan or such other time as requested by the Debtors for which such objection is timely filed. Such disputes shall not prevent or delay Confirmation or the occurrence of the Effective Date. Any counterparty to an Executory Contract or Unexpired Lease will be deemed to have consented to such assumption. If an application for Allowance of a Cure is resolved or determined unfavorably to the applicable Debtor, then such Debtor or corresponding Reorganized Debtor, as applicable, may either affirm the assumption and pay the Cure in accordance with such resolution or reject the applicable Executory Contract or Unexpired Lease, in which case the counterparty may file a proof of Claim within thirty (30) days after being served notice of the rejection.

If there is any dispute regarding any Cure costs, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of any Cure costs shall occur as soon as reasonably practicable after (1) entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment) or (2) as may be agreed upon by the Debtors (with the consent of the Required Consenting Second-Out Creditors, which shall not be unreasonably withheld, delayed, or conditioned) or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. The Debtors (with the consent of the Required Consenting Second-Out Creditors, which shall not be unreasonably withheld, delayed, or conditioned) and the Reorganized Debtors, as applicable, reserve the right at any time to move to reject any Executory Contract or Unexpired Lease based upon the existence of any such unresolved dispute.

Allowance and payment of a Cure in accordance with the Plan (including in the amount of $0.00, if applicable) shall constitute full and final satisfaction of all Claims arising from any defaults under an assumed Executory Contract or Unexpired Lease, whether monetary or not, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, that arose under such Executory Contract or Unexpired Lease

at any time before the date that the Executory Contract or Unexpired Lease was assumed, and such Cure shall be released and discharged upon such payment by the Debtors or Reorganized Debtors of such Cure cost. The Debtors or Reorganized Debtors, as applicable, also may settle any Cure costs without any further notice to or action, order, or approval of the Court. **Any and all proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this Article V.B, shall be deemed Disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Court.**

Entry of the Confirmation Order shall constitute the Court's finding of adequate assurance of future performance under all assumed Executory Contracts and Unexpired Leases.

C.    *Rejected Executory Contracts or Unexpired Leases*

A counterparty to a rejected Executory Contract or Unexpired Lease must file any proof of Claim for damages resulting from the rejection of its Executory Contract or Unexpired Lease within thirty (30) days following entry of the order (including the Confirmation Order, if applicable) approving such rejection. **Any Claim arising from the rejection of an Executory Contract or Unexpired Lease for which a proof of Claim has not been filed with the Court within such time shall be automatically Disallowed, released, and discharged, and forever barred from assertion without the need for any objection or further notice to, or action, order, or approval of, the Court, and such Claim shall not be enforceable against the Debtors, the Estates or the Reorganized Debtors, as applicable.** Any such Claim arising from the rejection of an Executory Contract or Unexpired Lease shall be classified as General Unsecured Claims and shall be treated in accordance with the Plan, the Bankruptcy Code, and applicable non-bankruptcy law.

D.    *Particular Contracts and Leases*

1.    Insurance Policies

Except as otherwise explicitly provided with respect to an Insurance Policy, all Insurance Policies, including D&O Policies, shall be assumed by the applicable Reorganized Debtors on the Effective Date and shall continue in full force and effect.

The automatic stay of section 362(a) of the Bankruptcy Code and the injunctions set forth in the Plan, if and to the extent applicable, shall be deemed lifted, solely with respect to insurance providers, claimants with valid workers' compensation Claims, and named beneficiaries of any Insurance Policy, solely to permit: (a) (i) workers' compensation claimants and named beneficiaries to proceed with their Claims and (ii) claimants to proceed with Claims with respect to which an order has been entered by the Court granting a relief from the automatic stay or the injunction set forth in the Plan to proceed under an Insurance Policy; and (b) insurance providers to administer, defend, settle, and pay, (i) workers' compensation Claims, (ii) direct claims against the Insurers under applicable non-bankruptcy law, and (iii) all costs in relation to each of the foregoing.

Confirmation shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the assumption of the D&O Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed under the Plan. The Debtors and, after the Effective Date, the Reorganized Debtors shall retain the ability to supplement the D&O Policies as the Debtors or Reorganized Debtors, as applicable, may deem necessary. For the avoidance of doubt, entry of the Confirmation Order will constitute the Court's approval of the Reorganized Debtors' assumption of each of the unexpired D&O Policies.

In addition, on or after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Policies (including any "tail policy" and all agreements, documents, or instruments related thereto) in effect on or prior to the Effective Date, with respect to conduct occurring prior to the Effective Date, and all current and former directors, officers, and managers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such D&O Policies for the full term of such policies regardless of whether such current and former directors, officers, and managers remain in such positions after the Effective Date, all in accordance with and subject in all respects to the terms and conditions of the D&O Policies, which shall not be altered.

2.      Indemnification Provisions

On and as of the Effective Date, to the extent permitted by applicable law and subject to the limitations set forth herein, the Indemnification Provisions will be assumed and be irrevocable and will survive the Consummation, and, to the extent not permitted to be assumed by applicable law, shall be included in the New Organizational Documents, in each case, on terms no less favorable to the Debtors' and the Reorganized Debtors' current and former directors, officers, equity holders (regardless of whether such interests are held directly or indirectly), managers, members, employees, accountants, investment bankers, attorneys, other professionals, agents of the Debtors, and such current and former directors', officers', direct or indirect equity holders', managers', members' and employees' respective Affiliates (each of the foregoing solely in their capacity as such) than the Indemnification Provisions, in place prior to the Effective Date ; *provided* that nothing herein shall expand any of the Indemnification Provisions in place as of the Petition Date or constitute a finding or conclusion that any party that may seek indemnification is entitled to indemnification under the terms of such Indemnification Provisions or is intended to effectuate the survival of any indemnification provisions (other than the Indemnification Provisions) for any other parties: *provided further* that none of the Debtors or the Reorganized Debtors will amend, augment, terminate, or adversely affect any of the Debtors' or the Reorganized Debtors' obligations under such Indemnification Provisions.

3.      Compensation and Benefits Programs

Unless otherwise provided herein and subject to Article V of this Plan, all Compensation and Benefits Programs shall be treated as Executory Contracts and deemed assumed by the Reorganized Debtors on the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code, except for: (a) all equity or equity-based incentive plans, employee stock purchase plans, and any other agreements or awards, or provisions set forth in the Compensation and Benefits Programs that provide for rights to acquire Interests or New Common Shares and any agreement or plan whose value is related to Interests or New Common Shares or other ownership interests of

the Debtors, in each case, shall not constitute or be deemed to constitute Executory Contracts and shall be deemed terminated on the Effective Date; (b) Compensation and Benefits Programs that have been rejected pursuant to an order of the Court; and (c) Compensation and Benefits Programs that, as of the entry of the Confirmation Order, have been specifically waived by their beneficiaries. Pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid or otherwise honored in accordance with applicable law.

A beneficiary of a Compensation and Benefits Program assumed pursuant to this Plan shall have the same rights under such Compensation and Benefits Program as they had thereunder immediately prior to such assumption (unless otherwise agreed by such beneficiary and the applicable Reorganized Debtor(s)); *provided, however*, that the Restructuring Transactions and the Plan and any associated organization changes shall not constitute a "change in control" or "change of control" or other similar event under any such Compensation and Benefits Program, and that neither assumption of Compensation and Benefits Programs hereunder nor any of the Restructuring Transactions shall trigger or be deemed to trigger any change of control, immediate or acceleration of vesting, termination, or, in each case, similar provisions therein.

E.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract and Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously terminated, rejected, or repudiated, is terminated, rejected, or repudiated under the Plan or is otherwise not in effect.

Modifications, amendments, supplements, and restatements to Executory Contracts or Unexpired Leases executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of such Executory Contracts or Unexpired Leases, or the validity, priority, or amount of any Claims that may arise in connection therewith.

F.    *Reservation of Rights*

Nothing contained in the Plan shall constitute an admission by the Debtors that any contract or lease is, in fact, an Executory Contract or Unexpired Lease or that the Debtors or the Reorganized Debtors have any liability thereunder.

G.    *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting any Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code. If this Plan is withdrawn after entry of a Confirmation Order, then the deadline under section 365(d)(4)(A) of the Bankruptcy Code shall be extended, pursuant to section 365(d)(4)(B), to the earlier of (i) the date that is thirty (30) days after withdrawal of the Plan or (ii) the date of entry of a subsequent order confirming a plan, but no later than 210 days after the Petition Date.

H.    *Contracts and Leases Entered into After Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or Reorganized Debtor, as the case may be, liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI
## PROVISIONS GOVERNING DISTRIBUTIONS

A.    *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan or paid pursuant to a prior Court order, on the Effective Date (or if a Claim or Interest is not Allowed on the Effective Date, on the date that such Claim or Interest becomes Allowed) or as soon as reasonably practicable thereafter, each Holder of an Allowed Claim or Allowed Interest shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date.

B.    *Disbursing Agent*

All distributions under the Plan shall be made by the Disbursing Agent. If the Disbursing Agent is one or more of the Reorganized Debtors, the Disbursing Agent shall not be required to give any bond or other security for the performance of its duties unless otherwise ordered by the Court. Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

All distributions to any Disbursing Agent on behalf of the Holders of Claims (or the designees of such Holders, as applicable) shall be deemed completed by the Debtors when received by such Disbursing Agent. Distributions made under the Plan shall be made to any such Holders (or the designees of such Holders, as applicable) by the applicable Disbursing Agent.

C.    *Rights and Powers of Disbursing Agent*

1.    Powers of the Disbursing Agent

Without further order of the Court, the Disbursing Agent shall be empowered to: (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all distributions contemplated hereby; (iii) employ professionals and incur reasonable fees and expenses to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.      Incurred Expenses

Except as otherwise ordered by the Court, the amount of any reasonable and documented fees and expenses incurred by the Disbursing Agent (including any of the Agents/Trustees or DIP Agent acting as Disbursing Agents) on and after, or in contemplation of, the Effective Date (including taxes) and any reasonable and documented compensation and out-of-pocket expense reimbursement claims (including reasonable and documented attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors in the ordinary course, without duplication of payments of Restructuring Expenses or Professional fees.

D.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.      Delivery of Distributions in General

Except as otherwise provided in the Plan or prior Court order, the Disbursing Agent shall make distributions to Holders of Allowed Claims as of the Distribution Record Date (or, if applicable, to such Holder's designee) at the address for each such Holder as indicated on the Debtors' records as of the Distribution Record Date; *provided*, *however*, that the manner of such distributions shall be determined at the discretion of Reorganized Debtors.

All distributions to holders on account of Allowed First-Out Revolving Loans Claims and Allowed ABL Facility Claims shall be deemed completed when made to or at the direction of the First-Out/Second-Out Agent or ABL Agent, respectively, which shall be deemed to be the Holder of such Claims for purposes of distributions to be made under this Plan. The First-Out/Second-Out Agent and ABL Agent, as applicable, shall hold or direct such distributions for the benefit of the holders of the foregoing First-Out Revolving Loans Claims and ABL Facility Claims. Neither the First-Out/Second-Out Agent or ABL Agent shall incur any liability whatsoever on account of any distributions under the Plan except where attributable to gross negligence or willful misconduct. If the First-Out/Second-Out Agent or ABL Agent is unable to make or consent to the Reorganized Debtors making such distributions, the Reorganized Debtors or an authorized Disbursing Agent, with the First-Out/Second-Out Agent's or ABL Agent's cooperation, shall make such distribution. The First-Out/Second-Out Agent and ABL Agent, respectively, shall have no duties, obligations, or responsibilities with respect to any form of distribution to Holders of the foregoing First-Out Revolving Loans Claims or ABL Facility Claims that is not DTC-eligible, and the Reorganized Debtors or a Disbursing Agent shall make such distributions. For the avoidance of doubt, all distributions referenced in this paragraph shall be subject to any charging liens exercised by the First-Out/Second-Out Agent or ABL Agent.

2.      Distribution Record Date

As of the close of business on the Distribution Record Date, all transfer ledgers for each Class of Claims or Interests maintained by the Debtors or their agents, to the extent applicable, shall be deemed closed, and there shall be no further changes in the record Holders of any of Claims or Interests. The Disbursing Agent shall have no obligation to recognize any ownership transfer of Claims or Interests occurring on or after close of business on the Distribution Record Date. The Disbursing Agent shall be entitled to recognize and deal only with those record Holders listed on the transfer ledgers as of the close of business on the Distribution Record Date, at which

time the claims register shall be deemed closed for purposes of determining whether a Holder of such a Claim is a record Holder entitled to Plan Distributions. The Distribution Record Date shall not apply to securities held through DTC for which a Plan Distribution is made in exchange for such securities.

The Reorganized Debtors shall seek the cooperation of DTC so that any distribution on account of Claims that are held in the name of, or by a nominee of, DTC, shall be made through the facilities of DTC on the Effective Date or as soon as practicable thereafter.

3.    Minimum Distributions

No fractional units of New Common Shares shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to the Plan would otherwise result in the issuance of a number of shares of New Common Shares that is not a whole number, the actual distribution of New Common Shares shall be rounded as follows: (i) fractions of one-half (½) or greater shall be rounded to the next higher whole number, and (ii) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized shares of New Common Shares to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

Notwithstanding any other provision of the Plan, no Cash distribution of less than $100.00 shall be required to be made to a Holder of an Allowed Claim on account of such Allowed Claim. The Allowed Claims to which this limitation applies shall be discharged and their Holders will be forever barred from asserting that Claim against the Debtors, the Reorganized Debtors, or their respective property.

4.    Undeliverable Distributions and Unclaimed Property

In the event that any distribution hereunder is returned as, and remains, undeliverable, no distribution to the applicable recipient shall be made unless and until the Disbursing Agent is notified in writing of such Holder's (or its designee, as applicable) then-current address, at which time such distribution shall be made to such Holder (or its designee, as applicable) without interest; *provided*, *however*, that all distributions returned as, and that remain, undeliverable for a period of ninety (90) days after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revest in the applicable Reorganized Debtor automatically and without need for a further order by the Court (notwithstanding any applicable federal, provincial, or state escheat, abandonment, or unclaimed property laws to the contrary), and the claim of any intended recipient to such property shall be discharged and forever barred.

Checks issued on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof. Thereafter, the amount represented by such voided checks shall irrevocably revert to the Reorganized Debtors and any Claim in respect of such voided check shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary. Requests for re-issuance of any check before ninety (90) days after issuance shall be made to the Disbursing Agent by the Holder of the Allowed Claim to whom such check was originally issued.

5.      Distributions on Account of Obligations of Multiple Debtors

Each Claim asserted against multiple Debtors shall be treated as a single Claim and its Holder shall be entitled to a single distribution.

E.      *Indefeasible Distributions*

Any and all distributions made under this Plan shall be indefeasible and not subject to clawback or turnover provisions.

F.      *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, Liens, and encumbrances. The Reorganized Debtors or the Disbursing Agent, as the case may be, may require, as a condition to receiving a distribution, that any intended recipient deliver to the applicable Disbursing Agent or, if different, the applicable withholding agent, a properly completed and duly executed IRS Form W-9 or (if the payee is a foreign person) an appropriate IRS Form W-8 (including any supporting documentation) (as applicable).

G.      *Allocations*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest as Allowed herein.

H.      *No Postpetition Interest on Claims*

Unless otherwise specifically Allowed pursuant to the Plan, the Confirmation Order, the DIP Orders, or other Court order or otherwise required by applicable law, postpetition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on such Claim.

I.      *Setoffs and Recoupment*

Except for Claims that are expressly Allowed hereunder, the Debtors and the Reorganized Debtors may, for purposes of determining the Allowed amount of such Claim on which distribution shall be made, but shall not be required to, set off against any Claim, any claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the Holder of such

Claim or Interest; *provided*, that neither the failure to do so nor the allowance of any Claim or Interest hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim the Debtors or the Reorganized Debtors may have against the Holder of such Claim or Interest; provided that no such setoff or recoupment shall be permitted against any ABL Facility Claim or First-Out Claim.

J.      *Claims Paid or Payable by Third Parties*

1.      Claims Paid by Third Parties

To the extent that the Holder of a Claim receives payment (before or after the Effective Date) on account of such Claim from a party that is not a Debtor or Reorganized Debtors (including any Insurer), such Claim shall be Disallowed and expunged without an objection having to be filed and without any further notice to or action, order, or approval of the Court; *provided*, *however*, that if such Holder is required to repay all or any portion of such Claim (either by contract or by order of the Court) to the party that is not a Debtor or Reorganized Debtor, and such Holder in fact repays all or a portion of the Claim to such third party (including an Insurer), the repaid amount of such Claim shall not be Disallowed and shall remain subject to the applicable provisions of the Plan. To the extent a Holder of a Claim receives a distribution on account of such Claim under the Plan and thereafter receives payment from a party that is not a Debtor or Reorganized Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the received distribution to the applicable Debtor or Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the Allowed amount of such Claim. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest on such amount owed for each Business Day after the fourteen (14)-day grace period specified above until the amount is repaid at the federal judgment rate in effect on the Petition Date.

2.      Applicability of Insurance Policies

Except as otherwise provided in the Plan, payments to Holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Policy. Except as otherwise expressly set forth in the Plan, nothing herein shall constitute or be deemed a release, settlement, satisfaction, compromise or waiver of any Cause of Action that any Debtors or any other Entity, including any Holders of Claims, may hold against any other Entity, including Insurers or any insured party, under any Insurance Policies, nor shall anything contained herein constitute or be deemed a waiver by any Insurers of any rights or defenses, including coverage defenses, held by such Insurers.

3.      Single Satisfaction of Claims

Notwithstanding anything else contained in the Plan or Confirmation Order, in no case shall the aggregate value of all property received or retained on account of an Allowed Claim (from whatever source) shall exceed one hundred percent (100%) of the Allowed amount of such Claim.

K.     *Allocation Between Principal and Accrued Interest*

Except as otherwise provided in the Plan, the aggregate consideration paid to on account of Allowed Claims pursuant to the Plan shall be treated as allocated first to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to the interest, if any, accrued through the Effective Date.

## ARTICLE VII
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

A.     *Disputed Claims Process*

Notwithstanding section 502(a) of the Bankruptcy Code, and in light of the Unimpaired status of all Allowed General Unsecured Claims under the Plan and as otherwise required by the Plan, Holders of Claims need not file proofs of Claim, and the Reorganized Debtors and the Holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Cases had not been commenced, except that (unless expressly waived pursuant to this Plan) the Allowed amount of such Claims shall be subject to the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable. Notwithstanding anything in this Plan to the contrary, disputes regarding the amount of any Cure pursuant to section 365 of the Bankruptcy Code and Claims that the Debtors seek to have determined by the Court, shall in all cases be determined by the Court.

For the avoidance of doubt, there is no requirement to file a proof of Claim (or move the Court for allowance) to be an Allowed Claim, as applicable, under the Plan. Notwithstanding the foregoing, Entities must file Cure objections as set forth in Article V.B of this Plan to the extent such Entity disputes the amount of the Cure paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty. **Except as otherwise provided herein, all proofs of Claim filed after the Effective Date shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Court.**

B.     *Allowance of Claims*

Except as otherwise set forth in the Plan, after the Effective Date, the Reorganized Debtors shall have any and all rights and defenses that the applicable Debtors had with respect to any Claim immediately before the Effective Date. For the avoidance of doubt, (i) Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Court shall not be considered "Allowed" for any other purposes and (ii) except to the extent expressly Allowed pursuant to the Plan, amounts that are not allowable under sections 502 or 503 of the Bankruptcy Code, as applicable, shall not be considered "Allowed." The Debtors, with the consent of the Required Consenting Second-Out Creditors, may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy Law.

C.      *Claims Administration Responsibilities*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority: (1) to file, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim or Interest without any further notice to or action, order, or approval by the Court; and (3) to administer and adjust such Claims or Interests any such settlements or compromises without any further notice to or action, order, or approval by the Court. For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including any Causes of Action retained pursuant to the Plan.

Notwithstanding the foregoing, the Debtors and Reorganized Debtors shall be entitled to dispute and/or otherwise object to any General Unsecured Claim in accordance with applicable non-bankruptcy Law. If the Debtors or Reorganized Debtors, as applicable, dispute any General Unsecured Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced. In any action or proceeding to determine the existence, validity, or amount of any General Unsecured Claim, any and all Claims or defenses that could have been asserted by the applicable Debtor(s) or the Entity holding such General Unsecured Claim are preserved as if the Chapter 11 Cases had not been commenced.

D.      *Estimation of Claims and Interests*

Before or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Court estimate any Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Court has ruled on any such objection, and the Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Court. In the event that the Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.

E.      *Time to File Objections to Claims*

Any objections to Claims shall be filed on or before the later of (1) 180 days after the Effective Date and (2) such other period of limitation as may be fixed by the Court.

F.      *Disallowance of Claims*

Any Claims held by Entities from which the Court has determined that property is recoverable under section 542, 543, 547, 548, 549, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer that the Court has determined is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant

58

to section 502(d) of the Bankruptcy Code, and Holders of such Claims shall not receive any distributions on account of such Claims until such time as all Causes of Action against that Entity under any of the foregoing provisions of the Bankruptcy Code have been settled or resolved by a Final Order and the full amount of such recoverable property has been paid or turned over to the Debtors or the Reorganized Debtors, as applicable.

**The Debtors are not establishing a bar date for General Unsecured Claims as such Claims are Unimpaired under the Plan; *however*, Claims arising from the rejection of an Executory Contract or Unexpired Lease must be filed with the Court within thirty (30) days following the entry of the order (including the Confirmation Order, if applicable) approving such rejection, in accordance with Article V.B and Article V.C.**

G.      *Distributions to Holders of Disputed Claims*

Notwithstanding anything to the contrary herein, if any portion of a Claim or Interest is Disputed, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Disputed Interest becomes Allowed.

To the extent that a Disputed Claim or Disputed Interest ultimately becomes Allowed, distributions (if any) shall be made to the Holder of such Allowed Claim or Allowed Interest in accordance with the provisions of the Plan, less any previous distribution, if any, that was made on account of the undisputed portion of such Claim. As soon as practicable after the date that the order or judgment finding or deeming any Disputed Claim or Disputed Interest to be Allowed has become a Final Order, the Disbursing Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

# ARTICLE VIII
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Compromise and Settlement*

The Confirmation Order will constitute the Court's finding and determination that the settlements reflected in the Plan are (1) in the best interests of the Debtors and their Estates, and all Holders of Claims or Interests, (2) fair, equitable, and reasonable, (3) made in good faith, and (4) comply with applicable bankruptcy law. The allowance, classification, and treatment of any Allowed Claims of a Released Party take into account any Causes of Action, whether under the Bankruptcy Code or otherwise, that may exist between the Debtors and any Released Party and, as of the Effective Date, any and all such Causes of Action are settled, compromised, and released as set forth in the Plan. The Confirmation Order shall authorize and approve, subject to Consummation, the releases of all contractual, legal, and equitable rights and Causes of Action that are satisfied, compromised, and settled pursuant hereto. Nothing in the Plan shall compromise, settle, or in any way whatsoever affect, any Causes of Action that the Debtors or Reorganized Debtors, as applicable, may have against any Entity that is not a Released Party.

In accordance with the provisions of the Plan, without any further notice to, or action, order, or approval of, the Court, after the Effective Date, the Reorganized Debtors may, in their sole and absolute discretion, compromise and settle (1) all Claims and Interests not previously Allowed (if any) and (2) claims and Causes of Action against other Entities.

B.    *Discharge of Claims and Termination of Interests*

Pursuant to section 1141(d) of the Bankruptcy Code and except as otherwise provided in the Plan, the Confirmation Order, any other Definitive Documents, or in any contract, instrument, or other agreement or document created or entered into pursuant to this Plan, effective as of the Effective Date: (1) the distributions, rights, and treatment that are provided in the Plan for all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Interests of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in the Debtors or any of their assets, property, or Estates, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims or Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts; (2) the Plan shall bind all Holders of Claims and Interests, notwithstanding whether such Holders failed to vote to accept or reject the Plan or voted to reject the Plan; (3) all Claims and Interests shall be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under sections 502(g), 502(h), or 502(i) of the Bankruptcy Code; and (4) all Persons and Entities shall be precluded from asserting against the Debtors, the Estates, the Reorganized Debtors, their successors and assigns, and their assets and properties any Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred before the Effective Date. The Confirmation Order shall be a judicial determination, subject to the Effective Date occurring, of the discharge of all Claims and Interests except as otherwise expressly provided in the Plan.

C.    *Release of Liens*

**Except as otherwise expressly provided in the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, including the Exit Term Loan Facility Documents, the Exit RCF Facility Documents, and the Exit ABL Facility Documents, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and the effectiveness of the Exit Term Loan Facility Documents, the Exit RCF Facility Documents, and the Exit ABL Facility Documents, and, in the case of a Secured Claim, in satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall automatically revert and, as applicable, be reassigned, surrendered, reconveyed, or retransferred to the Reorganized Debtors and each of their**

successors and assigns in each case, without any further approval or order of the Court and
without any action or filing being required to be made by the Debtors or the Reorganized
Debtors. Any Holder of such Secured Claim (and the applicable agents for such Holder,
including the Agents/Trustees and the DIP Agent) shall be authorized and directed to release
any such mortgages, deeds of trust, Liens, pledges, or other security interests and to take
such actions (including executing and filing Form UCC-3 termination statements,
intellectual property assignments, mortgage or deed of trust releases, or such other forms or
release documents in any jurisdiction) as may be requested by the Reorganized Debtors to
evidence the release of such mortgages, deeds of trust, Liens, pledges, or other security
interests, including the execution, delivery, and filing or recording of any related releases or
discharges as may be requested by the Reorganized Debtors or may be required in order to
effectuate the foregoing. The Reorganized Debtors (and any of their respective agents,
attorneys, or designees) shall be authorized to execute and file on behalf of creditors Form
UCC-3 termination statements, intellectual property assignments, mortgage or deed of trust
releases, or such other forms or release documents in any jurisdiction as may be necessary
or appropriate to evidence such releases and implement the provisions of this Article VIII.C,
including, for the avoidance of doubt, with respect to the DIP Facility. The presentation or
filing of the Confirmation Order to or with any federal, state, local or non-U.S. agency or
department shall constitute good and sufficient evidence of, but shall not be required to
effect, the termination of such mortgages, deeds of trust, Liens, pledges, or other security
interests.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged
in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any
Liens and/or security interests to secure such Holder's Secured Claim, then as soon as
practicable on or after the Effective Date, at the sole cost and expense of the Reorganized
Debtors, such Holder (or the agent for such Holder) shall take any and all steps reasonably
requested by the Debtors or the Reorganized Debtors, that are necessary or desirable to
record or effectuate the cancellation and/or extinguishment of such Liens and/or security
interests, including the making of any applicable filings or recordings, and the Reorganized
Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

D.    *Releases by the Debtors*

Notwithstanding anything contained herein or the Confirmation Order to the
contrary, pursuant to Bankruptcy Code section 1123(b), in exchange for good and valuable
consideration, the receipt and adequacy of which is hereby confirmed, on and after the
Effective Date, each Debtor, Estate, and Reorganized Debtor (in each case on behalf of
themselves and their respective Related Parties who may purport to assert any Claims,
obligations, rights, suits, damages, Causes of Action, remedies or liabilities) hereby
conclusively, absolutely, unconditionally, irrevocably, and forever releases and discharges
each and all of the Released Parties from any and all Claims, obligations, rights, suits,
damages, Causes of Action, remedies and liabilities whatsoever (including any Avoidance
Actions and any derivative claims, including those asserted or assertable on behalf of any
Debtor, Estate, or Reorganized Debtor), whether liquidated or unliquidated, fixed or
contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or
unasserted, accrued or unaccrued, existing or hereinafter arising, direct or derivative,

suspected or unsuspected, secured or unsecured, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that each Debtor, Estate, or Reorganized Debtor and/or its Related Parties or any other Entities claiming under or through them would have been legally entitled to assert in his/her or its own right (whether individually or collectively) or on behalf of any Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Estates, or the Reorganized Debtors (in each case, including the capital structure, management, direct or indirect ownership or operation thereof), the purchase, sale, or rescission any security of any Debtor, or Reorganized Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements or interactions between any Debtor, or Reorganized Debtor and any other Person, the Restructuring Transactions, the Restructuring Support Agreement, any Definitive Documents, the 2024 Transactions, the 2024 Transactions Documents, the DIP Facility, the DIP Orders, the DIP Facility Documents, the Disclosure Statement, the Exit Term Loan Facility, the Exit RCF Facility, the Exit Term Loan Facility Documents, the Exit RCF Facility Documents, the Equity Rights Offering, the ERO Backstop Agreement, the ERO Documents, the Exit ABL Facility, the Exit ABL Facility Documents, the Management Incentive Plan, the Plan, the Plan Supplement, the negotiation, formulation, preparation, or implementation thereof, the solicitation of consent or support with respect to the Restructuring or the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, in all cases, based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than any rights that remain in effect from and after the Effective Date to enforce the Definitive Documents and the obligations contemplated by the Restructuring Transactions (the "Debtor Release"). Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not (i) release any Causes of Action identified in the Schedule of Retained Causes of Action, (ii) release any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Term Loan Facility Documents, the Exit RCF Facility Documents, the ERO Documents, the Exit ABL Facility Documents, or any Claim or obligation arising under the Plan and any rights that remain in effect from and after the Effective Date to enforce the Definitive Documents and the obligations contemplated by the Restructuring Transactions, (iii) affect the rights of Holders of Allowed Claims to receive distributions under the Plan, (iv) release any claims or Causes of Action against any non-Released Party, or (v) release Claims or Causes of Action arising out of or relating to any act or omission of a Released Party that constitutes actual fraud or willful misconduct, each solely to the extent as determined by a Final Order of a court of competent jurisdiction.

Entry of the Confirmation Order shall constitute the Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Court's finding that the Debtor Release is: (i) in exchange for the good and valuable consideration

provided by the Released Parties; (ii) a good faith settlement and compromise of the Claims or Causes of Action released by the Debtor Release; (iii) in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests; (iv) fair, equitable, and reasonable; (v) given and made after notice and opportunity for hearing; and (vi) a bar to any of the Debtors, the Reorganized Debtors, or the Estates asserting any Claim or Cause of Action released by the Debtor Release against any of the Released Parties.

E.    *Releases by Holders of Claims or Interests*

Notwithstanding anything contained herein or the Confirmation Order to the contrary, pursuant to Bankruptcy Code section 1123(b), in exchange for good and valuable consideration, the receipt and adequacy of which is hereby confirmed, on and after the Effective Date, each Releasing Party (in each case on behalf of itself and its respective Related Parties who may purport to assert any Claims, obligations, rights, suits, damages, Causes of Action, remedies or liabilities) hereby conclusively, absolutely, unconditionally, irrevocably, and forever releases and discharges each and all of the Released Parties from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever (including any derivative claims, including those asserted or assertable on behalf of any Releasing Party), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or hereinafter arising, direct or derivative, suspected or unsuspected, secured or unsecured, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement or otherwise, that each Releasing Party and/or its Related Parties or any other Entities claiming under or through them would have been legally entitled to assert in his/her or its own right (whether individually or collectively) or on behalf of any Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Estates, or the Reorganized Debtors (in each case, including the capital structure, management, direct or indirect ownership or operation thereof), the purchase, sale, or rescission of any security of any Debtor, or Reorganized Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest affected by the Restructuring or the Chapter 11 Cases, the business or contractual arrangements or interactions between any Debtor, or Reorganized Debtor and any other Person, the Restructuring Transactions, the Restructuring Support Agreement, any Definitive Documents, the 2024 Transactions, the 2024 Transactions Documents, the DIP Facility the DIP Orders, the DIP Facility Documents, the Disclosure Statement, the Plan Supplement, the Exit Term Loan Facility, the Exit RCF Facility, the Exit Term Loan Facility Documents, the Exit RCF Facility Documents, the Equity Rights Offering, the ERO Backstop Agreement, the ERO Documents, the Exit ABL Facility, the Exit ABL Facility Documents, the Management Incentive Plan, the Plan, the Plan Supplement the negotiation, formulation, preparation, or implementation thereof, the solicitation of consent or support with respect to the Restructuring or the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, in all cases, based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date (the "**Third-Party Release**", and together with the Debtor

Release, the "<u>Releases</u>"). **Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not (i) release any Causes of Action identified in the Schedule of Retained Causes of Action, (ii) release any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Exit Term Loan Facility Documents, the Exit RCF Facility Documents, ERO Documents, Exit ABL Facility Documents, or any Claim or obligation arising under the Plan, and any rights that remain in effect from and after the Effective Date to enforce the Definitive Documents and the obligations contemplated by the Restructuring Transactions, (iii) affect the rights of any Holder of Allowed Claims to receive distributions under the Plan, (iv) release any claims or Causes of Action against any non-Released Parties, (v) release Claims or Causes of Action arising out of or relating to any act or omission of a Released Party that constitutes actual fraud or willful misconduct, each solely to the extent as determined by a Final Order of a court of competent jurisdiction, or (vi) release any lender under either the First-Out/Second-Out Credit Agreement or ABL Credit Agreement of any indemnification or contribution claims held by the prepetition First-Out/Second-Out Agent or the ABL Agent.**

**Entry of the Confirmation Order shall constitute the Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in this Plan, and, further, shall constitute the Court's finding that the Third-Party Release is: (i) consensual; (ii) essential to the Confirmation; (iii) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the restructuring and implementing this Plan; (iv) a good faith settlement and compromise of the claims or Causes of Action released by the Third-Party Release; (v) in the best interests of the Debtors and their Estates; (vi) fair, equitable, and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.**

F.    *Exculpation*

**Except as otherwise provided in the Plan or Confirmation Order, to the fullest extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party will be released and exculpated from, any claim or Cause of Action based on any act or omission occurring through the Effective Date in connection with or arising out of the administration of the Chapter 11 Cases, the negotiation and pursuit of the Restructuring Support Agreement, the Restructuring, the 2024 Transactions, the 2024 Transactions Documents, the DIP Facility, the DIP Orders, the DIP Facility Documents, the Disclosure Statement, the Exit Term Loan Facility, the Exit RCF Facility, the Exit Term Loan Facility Documents, the Exit RCF Facility Documents, the Equity Rights Offering, the ERO Backstop Agreement, the ERO Documents, the Exit ABL Facility, the Exit ABL Facility Documents, the Definitive Documents, the Plan Supplement, the Plan and related agreements, instruments, and other documents, or the solicitation of votes for, or confirmation of, the Plan, the funding of the Plan, the occurrence of the Effective Date, the administration of the Plan or the property to be distributed under the Plan, the issuance of securities under or in connection with the Plan, the purchase, sale, or rescission of the**

purchase or sale of any security of the Debtors or the Reorganized Debtors, or the transactions in furtherance of any of the foregoing, other than (a) Claims or Causes of Action arising out of or related to any act or omission of an Exculpated Party that is a criminal act or constitutes gross negligence, intentional fraud or willful misconduct as determined by a Final Order, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities (b) rights that remain in effect from and after the Effective Date to enforce the Definitive Documents, including the Restructuring Support Agreement, and the obligations contemplated thereunder, or (c) breach of such Exculpated Party's obligations under any Definitive Document. The Confirmation Order shall include a determination that the Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code and have participated in good faith with regard to the solicitation and distribution of securities pursuant to the Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of securities thereunder. This exculpation is in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

G.    *Injunction*

Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold claims or interests or Causes of Action or liabilities that have been released, discharged, or are subject to exculpation hereunder are permanently enjoined and precluded, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests or Causes of Action or liabilities; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action or liabilities; (3) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the respective property or estates of such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action or liabilities; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action or liabilities unless such Entity has timely asserted such setoff, subrogation, or recoupment right in a document filed with the Court explicitly preserving such right; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests or Causes of Action or liabilities released or settled pursuant to the Plan.

**By accepting distributions under the Plan, each Holder of an Allowed Claim or Interest extinguished, discharged, exculpated or released pursuant to the Plan shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunction set forth above.**

**The injunction set forth above shall extend to any successors of the Debtors, the Reorganized Debtors, the Released Parties, the Exculpated Parties, and their respective property and interests in property. No Person or Entity (including any Person or Entity that has elected to opt out of the Third-Party Releases) may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to Article VIII hereof, without the Court (1) first determining, after notice and a hearing, that such Claim or Cause of Action (a) is not subject to the Releases and (b) represents a colorable Claim or Cause of Action, and (2) specifically authorizing such Person or Entity to bring such Claim or Cause of Action.**

## ARTICLE IX
## CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE

A.     *Conditions to Effective Date*

The following are conditions to the Effective Date that must be satisfied or waived in accordance with Article IX.B:

1.     each of the Restructuring Support Agreement, the ERO Backstop Agreement, and the Exit Term Loan Facility Commitment Letter shall not have been terminated and remain in full force and effect and all conditions precedent thereunder shall have been satisfied or waived (save for the occurrence of the Effective Date);

2.     the Court shall have entered the Confirmation Order (in form and substance consistent with the Restructuring Support Agreement and otherwise acceptable to the Required Consenting Second-Out Creditors), which shall be a Final Order and shall not have been reversed, stayed, modified, or vacated on appeal;

3.     each document or agreement constituting a Definitive Document shall have been executed and/or effectuated, in form and substance consistent with the Restructuring Support Agreement and otherwise acceptable to the Required Consenting Second-Out Creditors, and any conditions precedent related thereto or contained therein shall have been satisfied prior to or contemporaneously with the occurrence of the Effective Date or otherwise waived in accordance with the terms of the Restructuring Support Agreement (as applicable) and the applicable Definitive Document;

4.     the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan, and all applicable regulatory or government-imposed waiting periods (if any) shall have expired or been terminated;

5.      all actions, documents, and agreements necessary to implement and consummate the Plan (including any Plan Supplement) shall have been effected and executed;

6.      the Debtors shall have substantially consummated, or contemporaneously with the occurrence of the Effective Date shall consummate, the Restructuring Transactions, in a manner consistent in all respects with this Plan and the Definitive Documents (including, for the avoidance of doubt, the ERO Backstop Agreement, the Exit Term Loan Facility Commitment Letter and the Restructuring Support Agreement, as applicable), unless waived by the Required Consenting Second-Out Creditors;

7.      the Final DIP Order shall be in full force and effect;

8.      all of the Exit Term Loan Facility Documents, the Exit RCF Facility Documents, and the Exit ABL Facility Documents shall have become effective (or shall become effective concurrently with effectiveness of the Plan), and any conditions precedent to effectiveness of the Exit Term Loan Facility, the Exit RCF Facility and the Exit ABL Facility shall have been satisfied or duly waived in writing, other than the occurrence of the Effective Date;

9.      the Equity Rights Offering (including the ERO Procedures) and the ERO Backstop Agreement (including, for the avoidance of doubt, the Direct Investment Shares and ERO Backstop Premium) shall have been approved by the Court and the Equity Rights Offering shall have been consummated in accordance with their terms;

10.     any conditions precedent related to any of the ERO Documents shall have been satisfied or waived, other than the occurrence of the Effective Date;

11.     the New Common Shares shall have been issued or delivered by Reorganized Parent;

12.     the New Organizational Documents shall have been adopted on terms consistent with the Restructuring Support Agreement and subject to any consent rights set forth in the Restructuring Support Agreement (including, for the avoidance of doubt, any exhibits thereto), and any conditions precedent related to the New Organizational Documents shall have been satisfied prior to or contemporaneously with the occurrence of the Effective Date or otherwise waived;

13.     all Professional Fees Claims shall have been paid in full or amounts sufficient to pay such Claims in full after the Effective Date have been placed in the Professional Fee Escrow Account as set forth in, and in accordance with, the Plan;

14.     all fees, expenses, and premiums payable pursuant to the Restructuring Support Agreement, the ERO Backstop Agreement, the Plan, and other Definitive Documents, or pursuant to any order of the Court shall have been paid by the Debtors or the Reorganized Debtors, as applicable, and all Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall have been paid in full in Cash by the Debtors or the Reorganized Debtors, as applicable;

15.     none of the Chapter 11 Cases shall have been converted to a case under chapter 7 of the Bankruptcy Code or dismissed;

16.     no Court order appointing a trustee or examiner with expanded powers with respect to the Debtors shall have been entered and remain in effect under any chapter of the Bankruptcy Code; and

17.     the Plan shall not have been materially amended, altered, or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration, or modification has been made in accordance with the terms of the Plan as confirmed by the Confirmation Order.

B.      *Waiver of Conditions*

The conditions to the Effective Date set forth in this Article IX may be waived by the Debtors upon the prior written consent of the Required Consenting Second-Out Creditors without notice, leave, or order of the Court; *provided* that the Debtors may not waive the conditions set forth in Article IX.A.2; *provided*, *further* that, the Debtors may not waive the conditions set forth in Article IX.A.8 (as to the Exit RCF Facility Documents) without the written consent of the Exit RCF Facility Lenders, Article IX.A.8 (as to the Exit ABL Facility Documents) without the written consent of the Exit ABL Facility Lenders and Article IX.A.14 (as to any amounts owing to the First-Out/Second-Out Agent, the ABL Agent or their respective professionals) without the written consent of the Revolving Credit Lenders. If the Plan is confirmed for fewer than all of the Debtors, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur.

C.      *Effect of Failure of Conditions*

If Consummation does not occur, this Plan shall be null and void in all respects and nothing contained in the Restructuring Support Agreement, the Plan, or the Disclosure Statement shall: (1) constitute a waiver or release by the Debtors or any Holder of Claims or Interests of any Claim or Interest; (2) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity, respectively; *provided* that all provisions of the Restructuring Support Agreement that survive termination thereof shall remain in effect in accordance with the terms thereof.

## ARTICLE X
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN

A.      *Modification and Amendments*

Except as otherwise specifically provided in the Plan, and subject to the Restructuring Support Agreement and the consent rights set forth therein, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan and the Restructuring Support Agreement, each Debtor expressly reserves its

rights to revoke, withdraw, alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, to the extent necessary to carry out the purposes and intent of the Plan and the Restructuring Support Agreement, including by structuring the Plan, the Restructuring, and the Restructuring Transactions in a manner that maximizes tax efficiencies. Each Debtor may, to the extent necessary, initiate proceedings in the Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan and the Restructuring Support Agreement.

> B.    *Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation of votes thereon are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

> C.    *Revocation or Withdrawal of Plan*

The Debtors reserve the right to revoke or withdraw the Plan with respect to any or all of the Debtors prior to the Confirmation Date and to file subsequent plans of reorganization or liquidation. If the Debtors revoke or withdraw the Plan or Confirmation or the Effective Date does not occur then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Class of Claims), assumption of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of any Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity. For the avoidance of doubt, except as provided in the Restructuring Support Agreement, nothing in the Plan shall be construed as requiring termination or avoidance of the Restructuring Support Agreement upon non-occurrence of the Effective Date (subject, in all respects, to any consent, termination, or other rights of the Consenting Stakeholders under the Restructuring Support Agreement) or as otherwise preventing the Restructuring Support Agreement from being effective in accordance with its terms.

## ARTICLE XI
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Court shall retain jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or Unsecured status or amount of any Claim or Interest, including (a) the resolution of any request for payment of any Administrative Claim and (b) the resolution of any objections to the Secured or Unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals;

3.      resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims for rejection damages or cure amounts pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed, or assumed and assigned; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished in accordance with the provisions of the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to sections 1141, 1145 and 1146 of the Bankruptcy Code;

7.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

8.      enter and enforce any order for the sale or transfer of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.     issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan and ensure compliance with the Plan;

11.     hear and resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the existence, nature, scope, or enforcement of any releases, exculpations, discharges, injunctions granted in the Plan, including those contained in Article VIII, and enter such orders as may be necessary or appropriate to implement or enforce such releases, injunctions, and other provisions;

12.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.J.1;

13.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.     determine any other matters that may arise in connection with, or relate to, the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15.     enter an order or final decree closing the Chapter 11 Cases;

16.     adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency with any Court order, including the Confirmation Order;

18.     determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20.     hear and determine matters concerning state, local, federal taxes and fees in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.     hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under Article VIII;

22.     determine whether and in what amount a Claim is Allowed;

23.     recover all assets of the Debtors and property of the Estates, wherever located;

24.     resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to the amount of a Cure, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

25.     hear and determine any rights, claims, or Causes of Action held by, or accruing to, any Debtor pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory;

26.     enforce all orders previously entered by the Court; and

71

27.     hear any other matter as to which the Court has jurisdiction.

*provided*, *however*, that documents contained in the Plan Supplement shall be governed in accordance with applicable jurisdictional, forum selection, or dispute resolution clauses in such documents.

## ARTICLE XII
## MISCELLANEOUS PROVISIONS

A.     *Immediate Binding Effect*

Subject to Article IX.A and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon Consummation, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims and Interests (irrespective of whether the Holders of such Claims or Interests have accepted or are deemed to have accepted the Plan), all Entities that are party, or subject, to the settlements, compromises, releases, discharges, and injunctions set forth in the Plan, each Entity acquiring property under the Plan, and any and all of the Debtors' counterparties to Executory Contracts, Unexpired Leases, and any other prepetition agreements.

B.     *Additional Documents*

On or before the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may enter into any such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest may, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan. For the avoidance of doubt, such agreements or documents shall not be materially inconsistent with the provisions of this Plan.

C.     *Payment of Statutory Fees*

All fees under 28 U.S.C. § 1930 and any interest thereon under 31 U.S.C. § 3717 (together, the "Statutory Fees") outstanding immediately prior to the Effective Date shall be paid by the Debtors in full in Cash on the Effective Date. On and after the Effective Date, the Reorganized Debtors shall be jointly and severally liable for paying any and all Statutory Fees in full in Cash when due in each Chapter 11 Case for each quarter (including any fraction thereof) until the earliest of such Chapter 11 Case being closed, dismissed or converted to a case under chapter 7 of the Bankruptcy Code. The Debtors shall file all monthly operating reports due before the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, the Reorganized Debtors shall file a post-confirmation quarterly report for each Chapter 11 Case for each quarter (including any fraction thereof) such case is pending, using UST Form 11-PCR. Notwithstanding anything to the contrary in the Plan, (i) Statutory Fees are Allowed; (ii) the U.S. Trustee shall not be required to file any request(s) for payment of the Statutory Fees; and (iii) the U.S. Trustee shall not be providing any release under the Plan.

D.     *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor before Consummation.

E.     *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

F.     *Notices*

All notices, requests, and demands to or upon the Debtors or Reorganized debtors, as applicable, shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered, addressed as follows:

If to the Debtors or Reorganized Debtors, to:

> United Site Services, Inc.
> 118 Flanders Road, Suite 1000,
> Westborough, MA 01581
> Attention:  John Hafferty
>                    haff@unitedsiteservices.com

> with copies (which shall not constitute notice) to:

Milbank LLP
55 Hudson Yards
New York, New York 10001
Attention:  Dennis Dunne
                   ddunne@milbank.com

>                   Samuel A. Khalil
>                   Skhalil@milbank.com

>                   Matthew L. Brod
>                   mbrod@milbank.com

>                   Lauren C. Doyle
>                   ldoyle@milbank.com

If to the Ad Hoc Group, to:

Akin Gump Strauss Hauer & Feld LLP
Robert S. Strauss Tower
2001 K Street, N.W.
Washington, DC 20006
Attention: Dan Fisher
            dfisher@akingump.com

            Scott L. Alberino
            salberino@akingump.com

Akin Gump Strauss Hauer & Feld LLP
2300 N. Field Street
Suite 1800
Dallas, Texas 75201
Attention: Zach D. Lanier
            zlanier@akingump.com

If to Clearlake Capital Group, in its capacity as a member of the Ad Hoc Group, to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention: Steven N. Serajeddini
            steven.serajeddini@kirkland.com

            Nicholas Adzima
            nicholas.adzima@kirkland.com

In the Notice of Entry of Confirmation Order, the Debtors shall notify all Entities that, in order to continue to receive documents after the Effective Date pursuant to Bankruptcy Rule 2002, such Entity (excluding the U.S. Trustee) must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After service of the Notice of Entry of Confirmation and the occurrence of the Effective Date, the Debtors shall be authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to the U.S. Trustee, those Entities whose right are affected by such documents, and those Entities who have filed such renewed requests.

G.    *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Court, and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. On the Effective Date, the automatic stay pursuant to section 362 of the Bankruptcy Code of any litigation proceedings against or involving the Debtors shall terminate, and (2) all injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

H.    *Entire Agreement*

Except as otherwise indicated, the Plan (including the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

I.    *Exhibits*

All exhibits, schedules, supplements, and appendices to the Plan (including any other documents to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date) are incorporated into and are a part of the Plan as if set forth in full in the Plan. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Court, the Plan shall control.

J.    *Non-severability of Plan Provisions*

Before Confirmation, if any term or provision of the Plan is held by the Court to be invalid, void, or unenforceable, the Court, at the request of the Debtors, may alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without consent of the Debtors; and (3) non-severable and mutually dependent.

K.    *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors shall be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and, pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys shall be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, none of any such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the securities offered and sold under the Plan and any previous plan.

L.    *Closing of Chapter 11 Cases*

On and after the Effective Date, after the full administration of the Chapter 11 Cases, the Chapter 11 Cases shall be deemed closed except for one of the Chapter 11 Cases as determined by the Reorganized Debtors, and all contested matters and adversary proceedings relating to any of

the Debtors (including Claim objections) shall be administered and heard in such Chapter 11 Case, irrespective of whether the contested matter or adversary proceeding was commenced against a Debtor whose Chapter 11 Case was closed. The Reorganized Debtors shall file with the Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Court to close the Chapter 11 Cases. Upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to change the name of the remaining Debtor and case caption of the remaining open Chapter 11 Case as desired, in the Reorganized Debtors' sole discretion.

The Reorganized Debtors may at any time seek to close the remaining Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

M.      *Document Retention*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with its current document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

N.      *Dissolution of Committee*

On the Effective Date, the Committee (if any) shall dissolve, and the members thereof released and discharged from all rights and duties arising, or related to, the Chapter 11 Cases; *provided* that following the Effective Date, the Committee (if any) shall continue in existence and have standing and a right to be heard for the following limited purposes and solely in accordance with the Committee's statutory and fiduciary duties: (a) Professional Fee Claims and/or applications, and any relief related thereto, for Committee Professionals; and (b) any appeals of the Confirmation Order or other appeals to which the Committee is a party. Except as set forth in the preceding sentence, the Debtors, the Reorganized Debtors, and the Estates shall not be responsible for paying any fees or expenses incurred by the Committee or any other statutory committee, including counsel and advisors thereto, after the Effective Date.

O.      *Deemed Acts*

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

P.      *Waiver or Estoppel*

Each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured, or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers filed before the Confirmation Date.

*[Remainder of page intentionally left blank]*

Dated: December 28, 2025

Respectfully submitted,

United Site Services, Inc., on behalf of itself and
each of its Debtor affiliates

By: ___/s/ John D. Hafferty_____
      Name: John Hafferty
      Title: Chief Financial Officer